### STATE v. SAM CALDWELL.

*Indictment for Murder—Jurisdiction—Constitutional Law— Blow inflicted in another State resulting in death in this State— Dying Declarations—Evidence.*

1. The Act of 1891, chapter 68, providing that "if a mortal wound is given, or other violence or injury inflicted, or poison is administered on the high seas or land, either within or without the limits of this State, by means whereof death ensues in any county thereof, said offence may be prosecuted and punished in the county where the death happens," is constitutional, and applies to foreigners as well as to citizens of this State who have inflicted mortal wounds elsewhere.

2. Section 2 of Article 3 of the Constitution of the United States, providing that the trial shall be held in the State where the crime was committed, applies to United States Court proceedings only, relating only to prosecutions for offences against the United States.

3. Where, in a trial for murder, it appeared that the deceased, before making his declaration as to the circumstances under which the mortal blow was given, told his physician that he knew he was going to die, such declaration is not rendered inadmissible by the fact that the physician told him that he thought deceased would die, but hoped that he would not, and that another person told him that his physician had hopes for him.

4. Where, in a trial of a prisoner for murder, it does not appear that any judicial investigation was had before a Justice of the Peace, a statement made by the prisoner before such Justice is admissible as evidence against him.

Indictment for murder, tried before *Meares, J.,* at August Term, 1894, of the Criminal Court of MECKLENBURG County.

The defendant was charged with the murder of one Bob Nelson, upon the following bill of indictment, viz. :

" The jurors for the State, upon their oath, present that Sam Caldwell, late of Mecklenburg County, at and in said county, on the 10th day of May, 1894, with force and arms, did feloniously, wilfully, and of his malice aforethought, kill and murder Bob Nelson, against the form of the statute in such cases made and provided, and against the peace and dignity of the State."

Before the plea of not guilty was entered, the defendant offered the following affidavit, viz. :

" Sam Caldwell, being duly sworn, says, that he is informed and believes, that the alleged homicide, for which he stands indicted in the Criminal Court, was committed, if anywhere, in the County of York, and State of South Carolina, and not in the County of Mecklenburg, and State of North Carolina, as alleged in the bill of indictment in the case above named."

Having introduced the foregoing affidavit, the defendant entered a plea in abatement, on the ground that the Court did not have jurisdiction.   The plea in abatement was overruled by the Court and the case was ordered to proceed to trial.   The defendant excepted to the ruling of the Court in overruling the plea in abatement.   The defendant pleaded not guilty, and the State introduced as a witness Dr. J. J. Rone, who testified as follows, viz. :

" About the 15th of May, 1894, I saw Bob Nelson, since deceased, two and a half miles below Pineville, lying in some bushes near the railroad track.   His head was badly injured by some dull instrument.   There were three blows upon his head—one scalp wound upon the back of his head, and one blow upon each side of the head, near the temple bone.   He was carried to Pineville about an hour afterwards. He lived ten days.   The bone was crushed on the right and

left temple, and an abscess formed on the brain under the left temple, which was the immediate cause of his death. Either of the wounds on the sides of his head would have produced death. He was unconscious when I found him, near a little path leading from the railroad about twenty steps from the railroad track. · There were signs in the path of a struggle, and the body had been dragged to the place where I found it." Here the State proposed to ask the witness what the deceased told him as to how the difficulty between the prisoner and deceased took place. Defendant objected, and the witness testified as to the condition of deceased when he (deceased) made the statements, as follows, viz.: "On the third day (after the deceased was stricken) deceased was conscious and ·his mind seemed brighter. I told him that I thought he would die, but that his recovery was possible, but not probable. That I had heard of men's brains being partly knocked out and then recovering, and that I hoped he would get well. He said he thought he would die. I had two other conversations with him of the same purport. On the fifth day he walked to the door with me, and said he wanted to talk to me again about the matter, and he went through the particulars as to how the affair had happened. In this conversation he again said that he would have to die, that he could not live with his head crushed in that way. I told him I thought he would die, but hoped he would get well."

The defendant objected to the admission of the declaration of the deceased, and at defendant's request E. W. Russell was put upon the stand and said that he saw the deceased just before the doctor did, and told him (deceased) that the doctor had hope for him. (Russell being a State's witness, the defendant objected to the admission of declarations of deceased.) The Court overruled the objection, and the defendant excepted. The witness Russell proceeded to testify as follows, viz.: "The deceased said he was looking

STATE *v.* CALDWELL.

for prisoner; that he came across prisoner on the railroad; that he and prisoner walked down the railroad till they came to a path, and went a little ways up the path, and prisoner asked him what he was doing. He told him he was squirrel hunting. Prisoner said, ' Yes, I know what squirrels you are hunting,' and then to allay the suspicions of the prisoner, he (deceased) fired off his gun, one barrel. Then we (prisoner and deceased) sat down and were talking, when prisoner said, ' Look yonder, what a fire!' and as deceased turned his head to look, the prisoner struck him (deceased) on the head with a rock, and he (deceased) could not remember anything more. The place where the assault occurred is between a mile and a mile and a half beyond the South Carolina line, in South Carolina. Deceased said when he met prisoner he asked who he was, and prisoner replied, ' Sam Caldwell.' He (deceased) said he did not attempt to arrest prisoner; that he had no papers, and he wanted to fool him back over the line, so that someone could arrest him who had authority. That both the prisoner and deceased were citizens of Mecklenburg County in this State."

The State rested here, tendering the other witnesses to the defendant for examination. Whereupon William Keener was called, and testified as follows, viz.:

" I waited on deceased. He would ask me to do something for his head, saying he would die if I did not. He often would say that he would die, but I told him that he would get well, to encourage him. He (deceased) said he was hunting prisoner. That he first came suddenly on prisoner, who was up a tree. To show prisoner that he had no intention of molesting him, he fired off his gun. Prisoner told him if he was a friend of his (prisoner's) to shoot off his gun, and then he shot it off. Prisoner called his attention to a fire, and as he looked prisoner struck him."

The prisoner Sam Caldwell was then introduced in his own behalf, and testified as follows, viz.:

" I was walking down the railroad and the deceased over-took me, walking fast and holding his gun half raised. Just before deceased overtook me, not knowing the man, and judging from his manner that he had some intentions toward me, I asked him if he was hunting, in order to get a word out of him. He did not answer, but asked me my name. I answered, ' Sam Caldwell.' He then pulled his gun on me and said, ' Get before me,' and as I turned to get before him the gun fired ; then I seized the gun, having squatted under him. Then the struggle commenced. After we had strug-gled some little time, I snatched the gun from his hands. He seized me. I threw the gun down and the struggle con-tinued, his efforts seeming to be to recover the gun. We were partly down on our knees. Deceased got my finger in his mouth and I could not free myself. I picked up a rock and struck deceased on the back of the head. This blow had no effect on him and I struck him again on the left side of the head. This blow released my finger, but he continued to struggle, and I struck him on the right side of the head. This blow weakened him and I did not strike him any more. I did not know the man and had no harm against him. After the difficulty I went my way."

State resumed, and introduced E. L. Yandle and proposed to show by him a statement made by the prisoner before a magistrate the day after the difficulty. Defendant objected. On examination by the Solicitor the witness, in order to qualify himself, testified as follows, viz.: " After the prisoner was arrested he asked to see a magistrate. We went before a magistrate, and he told the magistrate that he wanted to make a statement, and the magistrate told him he could do as he pleased, and warned him that it might be used against him. I do not know whether prisoner was sworn or not, nor do I know whether his testimony was taken down in writing or not." The defendant's objection was overruled, and he excepted. The witness said, " We went to the mag-

istrate to get a mittimus, and prisoner insisted on making a statement. It was substantially as here, except that he said there that deceased fired one shot before there was any struggle and fired a second shot when the scuffle began."

The evidence here closed. The defendant asked the Court to charge the jury that there was a fatal variance between the allegation and the proof, in that the bill of indictment alleged a murder committed in the county of Mecklenburg, and State of North Carolina, whereas the proof showed that the murder, if any, was committed in the county of York and State of South Carolina. The Court refused to give this instruction and the defendant excepted.

Verdict of manslaughter. There was a motion for a new trial, which was refused and defendant appealed assigning the following errors, viz.:

"1. That the Court erred in overruling the plea in abatement, to the jurisdiction.

" 2. That the Court erred in admitting the dying declarations of the deceased.

" 3. That the Court erred in admitting the statement of the prisoner made before the magistrate.

" 4. That the Court erred in charging that there was no evidence to go to the jury.

" 5. That the Court erred in refusing to charge that there was a fatal variance between the allegation and the proof."

Motion for new trial overruled. Defendant excepted. Judgment. Defendant appeals.

*The Attorney General,* for the State.

*Messrs. James A. Bell* and *H. N. Pharr,* for defendant (appellant).

SHEPHERD, C. J.: There are several exceptions in the record, but the only one argued by counsel in this Court involves the validity of the Act of 1891, ch. 68, which pro-

vides that " if a mortal wound is given, or other violence or injury inflicted, or poison is administerd on the high seas or land, either within or without the limits of this State, by means whereof death ensues in any county thereof, said offence may be prosecuted and punished in the county where the death happens." This statute is the same, *in totiden verbis*, as the Acts of Massachusetts and Michigan, and is substantially similar to the Act of 2 Geo. II., and of many of the States of this Union. In sustaining the validity of this legislation the Supreme Court of Massachusetts in *Commissioners* v. *McLoon*, 101 Mass. (GRAY, J.), remarked that "this statute is founded upon the general power of the Legislature, except so far as restrained by the Constitution of the Commonwealth and of the United States, to declare any wilful or negligent act which causes an injury to persons or property within its territory to be a crime, and to provide for the punishment of the offender upon being apprehended within its jurisdiction. Whenever any act, which if committed wholly within one jurisdiction would be criminal, is committed partly in and partly out of that jurisdiction, the question is whether so much of the act as operates in the county or State in which the offender is indicted and tried has been declared to be punishable by the law of that jurisdiction." Kerr on Homicide, 225; *State* v. *Hall*, 114 N. C., 909. The statutes referred to, and those providing that the offender may be indicted in the State where the assault is committed, although the death occurs in another State (*The Code*, sec. 1197), were evidently intended, among other reasons, to solve the much debated question whether at common law the offender could be tried at all, that is, in either jurisdiction, the doubt suggested being that the offence was complete in neither. This uncertainty led to the enactment of 2 and 3 Edw. VI., which provided that the offender might be tried in the county of the death, although the blow was inflicted in another county. This statute, either as a part of the com-

STATE v. CALDWELL.

mon law or by re-enactment, is in force in many of the States of the Union. The validity of such legislation does not seem to have been questioned, but where the principle has been extended to cases in which the blow is in another State or county, it has been very vigorously assailed. It is insisted that the crime was complete where the blow was inflicted and that such legislation is therefore contrary to Art. III., section 2 of the Constitution of the United States, which provides that the trial " shall be held in the State where the said crime shall have been committed." In *Tyler* v. *People*, 8 Mich., 319, the Court in sustaining the statute used the following language : " The shooting itself, and the wound which was its immediate consequence, did not constitute the offence of which the prisoner is convicted. Had death not ensued, he would have been guilty of an assault and battery, not murder ; and would have been criminally accountable to the laws of Canada only. But the consequences of the shooting were not confined to Canada. They followed Jones into Michigan, where they continued to operate until the crime was consummated in his death."

This reasoning is quoted with entire approval in *Commissioners* v. *McLoon, supra,* and the Court, in speaking of the dissenting opinion in the foregoing case, said that it " proceeds upon the ground that no part of the criminal act of the defendant was done at the place of the death, a position which seems to us to be untenable, for the reasons already stated, and the ingenious arguments and illustrations adduced in support of which will not stand a critical examination." Mr. Bishop (1 Criminal Law, 112, 161) takes the opposite view, that death is but a consequence of the unlawful blow, and that the offender has committed no breach of the law in the jurisdiction where the death occurred.

We deem it unnecessary to enter into an elaborate discussion of this question, as it is exhaustively treated by Justice GRAY in McLoon's case, *supra,* and by Justice BRANNON, in

115—51

the recent decision of the Supreme Court of West Virginia in *Ex parte* McNeely, 36 West Va., 84. In both of these cases, as in Tyler's case, *supra,* the validity of this legislation is sustained.

In *Hunter* v. *State,* 40 N. J., 495, Chief Justice BEASLEY says that the contrary view indicated by the Justice in delivering the opinion in *State* v. *Carter,* 27 N. J., 499 (cited by counsel), was "entirely extra judicial," and he commends the Courts sustaining statutes of this character as entitled to the highest respect. See also the authorities cited in *State* v. *Hall, supra.*

In the *United States* v. *Guiteau,* 47 Am. Rep., 261, Mr. Justice BRADLEY said: "There is no doubt that the Legislature might have enacted, in so many words, that if either the mortal stroke should be given or the consequent death should happen within the territory, it should be deemed a murder committed here." The cases from Michigan and Massachusetts are directly in point against the position that the offence was wholly committed in the State where the blow was stricken. There are other cases which lead to a similar conclusion, though the precise question was not distinctly presented.

This view would, of course, take the case out of the supposed constitutional limitation, but it must be borne in mind that the provision of the Constitution referred to is not a limitation upon the power of the State. Even Mr. Bishop concedes that it is not a question of constitutional law. In McNeely's case, while the learned Justice seemed to be of the opinion that the place of the blow was the place of the crime, he nevertheless came to the conclusion that there was no constitutional restriction upon the State to enact the law in question. He remarks: "Mr. Bishop, the great author, while resisting such statutes with reasoning which seems to me to be very strong and satisfactory, yet says that the question is not one of constitutional law, but one of international

law, and properly admits that if a Legislature command a Court to violate international law, it is bound to do so. See Endlich Interpretation of Statutes, 175. If, then, he be right in the question not being one of constitutional law, this Court could not, on his theory, refuse to execute this law. * * * In none but a case of very plain infraction of the Constitution, where there is no escape, will or ought a Court to declare a statute unconstitutional. To doubt is only to affirm the validity of the law." After stating that there are no cases directly declaring such statutes unconstitutional, and instancing the cases of McLoon and Tyler, in which they were distinctly upheld, and other cases which concede their validity, the Court continues: "As to the contention that the statute before us violates Art. 2, sec. 3 of the United States Constitution, we need only say that it applies to United States Court proceedings relating only to proceedings for offences against the United States. So does Amendment 6; *Fox* v. *Ohio*, 46 U. S., 410; *Cook* v. *United States*, 138 U. S., 157; *Baron* v. *Baltimore*, 32 U. S., 243; *Spies* v. *Illinois*, 123 U. S., 131."

We are not inadvertent to the possible inconveniences attending the administration of this law, in cases where the blow is inflicted in distant places, but, as was said in Tyler's case, "the expediency or policy of the statute has nothing to do with its constitutionality." It is argued that the statute should be construed in reference to international law, and that it should be confined to citizens of this State who have inflicted mortal wounds elsewhere. It is sufficient to say that we have no authority to so restrict the plain and broad language of the law, and such was the ruling in the cases of McLoon and Tyler, *supra*.

After a careful consideration of the able brief of counsel, we must conclude that these authorities are sufficient to warrant us in sustaining the statute under consideration. It may be observed that the case of *State* v. *Outshall*, 110 N. C., 538 (cited on the argument), expressly refrains from passing

STATE v. CALDWELL.

upon this question, and impliedly recognizes the validity of such legislation in cases of homicide. In that case it was clear that the crime of bigamy was fully completed in South Carolina.

The other exceptions growing out of the provisions of the statute, such as variance and the like, must, under the view we have taken, be overruled. What the indictment should charge as to the place, etc., is satisfactorily discussed in McLoon's case and sustains the ruling of his Honor. The other exceptions were not pressed on the argument, but should be noticed. We can see no error in admitting the dying declarations of the deceased, as testified to by Dr. Rone. Under the circumstances stated by this witness, and especially the conversation at the time of the declaration (in which deceased said he would have to die, that he could not live with his head crushed in that way, the witness telling him that he thought he would die but hoped he would get well), we think the Court was warranted in admitting the testimony. The fact that another witness had told the deceased, just before the doctor saw him, that the doctor had hopes of him, cannot alter the result. This was subsequently corrected by the doctor himself.

Neither is there any merit in the objection to the statement of the prisoner before the Justice of the Peace. It does not appear that there was any judicial investigation before him.

The plea in abatement was also properly overruled. *State v. Merritt*, 83 N. C., 677.

After a careful examination of all of the exceptions in the record, we see no reason for disturbing the judgment of the Court below.                              Affirmed.