The prisoner was charged with the murder of A. C. Sedberry on 19 July, 1924, and he appealed from the judgment pronounced on conviction for murder in the first degree. At the trial he did not testify or introduce any evidence. The salient features of the State's evidence are substantially as follows:
On the day of the homicide the deceased was engaged in scraping the public road leading from White Store to Peachland. He and Baxter McRae were running a road grader which was pulled by a truck, McRae operating the truck and the deceased the grader. They met a car driven by Frank Gulledge, in which were Jack Polk, Henry Watts and Jack *Page 17 
Crowder. The prisoner was on the running board. During a part of 1924 the prisoner had worked for the deceased, but had left him and was employed by William Gulledge when the homicide occurred. The deceased had the car to stop when it approached the truck and this conversation followed: Sedberry: "Jim, why did you do like you did this morning?" Collins: "Did what?" Sedberry: "Send Oscar Gulledge for the money." Collins: "I just sent him." Sedberry: "Ain't you a man of your own?" Collins: "I am." Sedberry: "Why did you not come and get it?" Collins: "I just didn't come." Sedberry: "I owe you $2.37 and carried you one night to see the doctor, didn't I?" Collins: "You did." Sedberry: "I didn't intend to charge you for that if you had stayed your time out that you hired to work, but as you did not, I am going to charge you $2.50 for that trip; that leaves you owing me thirteen cents, and I'm going to strike off even with you." Collins: "I don't give a d___n what you do with it." Sedberry (after stepping down from the road machine): "Don't you cuss me." Collins: "I didn't cuss you." Sedberry: "You cussed at me." The subsequent conduct of the two is described by Baxter McRae: "Sedberry then got hold of Jim, pulled him off the fender of the car, hit at him and slapped him a time or two after he stepped on the ground. He hit him across the head, and while being hit, Jim was holding up his hands. Sedberry then turned Jim loose and Jim stepped back and opened his knife and started to him, and Sedberry picked up a rock and said, `Don't you come on me with that knife.' Jim then backed off and closed the knife. Sedberry then got back on the road machine and said, `Let's go,' and we started down the road. This happened just beyond Jack Polk's house. Jim started following us up the road, and Jack's wife called to him from the window and said, `Don't you come up here; go back the other way.' When we got about fifty yards beyond Jack Polk's house, Jim Collins came on down there again and hollered to me to stop the truck. He spent the nights at Jack Polk's, but worked for and boarded with Mr. Gulledge. When we had gone about fifty yards on the opposite side of Jack's house, Jim came down near where we were and hollered to me to stop the truck. Sedberry said, `Go on.' Then Jim aimed the gun at Sedberry and looked up. Just at that time Jack Polk ran up, jerked the gun down and it fired in the ground about three feet behind the scraper. The gun looked like it was aimed at Sedberry's head. Jim and Jack went back towards the house tussling over the shotgun. Jack was trying to take the gun away from him and finally did get it. They tussled for about fifty yards over the gun going towards Jack's house. We went on down the road across the swamp with the truck and scraper, and when we had gotten about 290 yards from where the gun was fired I saw Jim Collins coming, and said, `Here *Page 18 
comes that negro.' Sedberry looked around, and Collins shot while he was running. He didn't say a word and shot one time, turned around and went back. He shot with a thirty-two Colt's automatic pistol. He was running when he shot. It is three hundred and thirty-five yards from where he overtook us to Jack Polk's house. He got within about twenty-five feet of Sedberry before he shot. I saw that he was shot just above the hip. I helped him get on the truck and carried him to White Store. It was about three hundred and eighty-five yards from where we first met Collins to where he shot Sedberry. It was from a half to three-quarters of an hour from the time of the quarrel in the road until Collins shot Sedberry."
Jack Polk testified as to the shooting: "I rode off on the running board and after getting up the road a little way I saw Jim coming out of my house with my gun going down the road towards Sedberry. I told Mr. Gulledge to look yonder Jim's got my gun, stop and let me get off, he slowed up, I jumped off and went running back towards where Jim was. I met my wife and she said `Jack where are you going?' I said `don't you see Jim with my gun, I am going to get it from him.' I overtook him and he had the gun cocked and aimed at Mr. Sedberry. I grabbed the gun and said, `What you mean? Give me my gun. What you mean by taking my gun out of the house? Give me my gun and let that man alone.' It fired just as I knocked it down. Then me and Jim tussled over it. While we were tussling I told him to give me my gun and asked him didn't he have good sense, and let the man alone, and after a while I got it loose from him, we were near the house when I got it. I ran in the house with the gun and went in the back part of the house and saw him near me when I went in the dining room and he come in behind me when I was putting up the gun, and when I looked around he was going around the house on the left side. He was going back toward Sedberry. I went out the back door, I didn't see any pistol, didn't know he had one and had never seen him with one. My wife was going up the road calling me to come on. I was not going toward the truck. The last I saw of Jim he was going around the house in the direction of the truck. He was running. The next time I saw him he was up the road toward Mr. William Gulledge's, he didn't say anything about shooting Sedberry. I knew he had been shot and didn't say anything to him. He told me to get his money from Mr. Gulledge and give it to him."
The foregoing testimony was corroborated by other witnesses, but under cross-examination they modified or varied their statement as to some of the circumstances. There was also evidence tending to show that the deceased beat the prisoner on the head and caused him to become highly excited; that soon after the fatal shot was fired the prisoner *Page 19 
said that he had shot a man and wanted to give himself up to the sheriff; that he told William Gulledge that he had shot the deceased and wanted his money at once; that Gulledge told him to go to Ben White's and stay there until he could go to the store and get some change, but a large crowd soon gathered near by; that the deceased was a white man, six feet in height, weighing about 215 pounds and the prisoner a colored boy about 19 or 20 years of age.
Dr. Hart testified as follows: "I was called to see A. C. Sedberry on the 19th of July, 1924; found him lying on the porch of Mr. E. E. McRae's house at White Store with a pistol shot wound in his back. The bullet entered the body about three inches to the left of the spinal cord and just above the hip bone, passing upward and to the right — penetrating the intestines ten times, cutting the liver, severed the nerve and arteries, and lodged just under the last rib on the right side. He was brought to the hospital here and the bullet removed and intestines sewed up. He suffered intensely and bled profusely. His chance was mighty small, but we operated to give him the benefit of the doubt, and he died Sunday morning, 20 July, 1924, about 5:00 o'clock. His death was caused by the pistol shot wound."
Other testimony is referred to in the opinion.
On his cross-examination the sheriff testified that he learned of the homicide about noon and went immediately to White Store and thence to the home of Henry Collins, the prisoner's brother. He was then asked this question: "Did you receive information from the defendant's brother Henry that he was close by and ready to surrender?" The State's objection was sustained and the prisoner excepted.
There are two grounds upon which the ruling may be upheld: (1) Neither the form of the question nor the record indicates what the answer would have been. S. v. Ashburn, 187 N.C. 717, 722; Barbee v. Davis, ibid., 79, 85; Hosiery Co. v. Express Co., 186 N.C. 556; S. v. Jestes, 185 N.C. 735;Snyder v. Asheboro, 182 N.C. 708. (2) The proposed evidence was inadmissible as hearsay. Evidence is termed hearsay when its probative force depends in whole or in part upon the competency and credibility of some person other than the witness from whom the information is sought; and such evidence, with certain recognized exceptions not applicable here, is uniformly held to be objectionable, the declarant not having spoken under the sanction of an oath and not having submitted to cross-examination.Chandler v. Jones, 173 N.C. 427; S. v. Springs, 184 N.C. 768. *Page 20 
The witness testified further that soon after he arrived at the scene of the homicide he saw probably seventy-five armed men between White Store and Gulledge's house, and that on Sunday the number increased possibly to a thousand men, many of whom were armed. The prisoner sought to show that on the day of the homicide and again on Sunday threats had been made against him by some of these men; and to the exclusion of the evidence he duly excepted.
As suggested above there is nothing in the record from which we may ascertain whether the witness would have given an affirmative or negative answer to the questions propounded. But apart from this, there is no evidence that the prisoner had heard of such threats or that his flight was influenced by them; and if it be granted that the sheriff was followed by four armed men when he went the second time to Henry Collins's house and that he got possession of a pistol while in the woods near by, we find no evidence that the prisoner was there or knew of the presence either of the officer or the men who followed him. Moreover, he was convicted of murder in the first degree; and as flight is not evidence of premeditation and deliberation the motive impelling flight may not be shown for the purpose of repelling the inference of such premeditation and deliberation. S. v.Foster, 130 N.C. 666, 675; S. v. Westmoreland, 181 N.C. 590, 595. Exceptions 1, 2, and 6 cannot be sustained; and on the same principle exception 5 must be overruled.
Concerning the dying declaration of the deceased, J. C. Sedberry, his brother said: "On Sunday morning, 20 July, just before he died, he told me he was going to die, that he could not last much longer, and he wanted to tell me how this thing occurred, and I told him to go ahead and tell me, but make it brief as he could because of his weakened condition. I was with him from the time I reached Wadesboro until his death. He had been operated on before I got there. I don't know how long he was under the effects of either or chloroform and don't know how much medicine had been given hypodermically. I understood they had to give him injections of some drug, I didn't know what. I did not see any administered. The nurses were passing back and forth all during the night doing something. He died about fifteen minutes or twenty minutes after his conversation with me. He was conscious up to the last. His mind seemed to be clear, of course he was suffering. He said he was on the grader, and Baxter McRae was driving the truck in front of him, and Jim Collins slipped up behind, and Baxter McRae hollered to him or called his attention to say, `There comes that negro,' and that he had just started to look around as the negro fired, and as soon as he fired the pistol he turned and ran back the other way and did not say a word, neither one spoke to the other." *Page 21 
Miss Miller, superintendent of the sanatorium, testified: "I was present when he made the statement to his brother between four and five o'clock Sunday morning. His mental condition was very clear. He said he knew he was not going to live and he wanted to make the statement. And he said he wanted to tell his brother exactly how it happened, and he said he was on the grader and Mr. McRae told him to look out this man was behind him and he started to turn and was shot."
The prisoner's exception to these declarations is based on the theory that they are in conflict with the testimony of all the eye-witnesses and that the deceased at the time was either unconscious or inadvertent to the circumstances, manifested by his silence as to his assault on the prisoner.
The rule for the admission of dying declarations is thus stated: (1) At the time they were made the declarant should have been in actual danger of death; (2) he should have had full apprehension of his danger; (3) death should have ensued. S. v. Mills, 91 N.C. 581, 594. The evidence excepted to disclosed all these conditions. In S. v. Williams, 168 N.C. 191, it is said that dying declarations are frequently made under conditions which render it impossible for the declarant to state in detail the circumstances connected with the killing; and in S. v. Brinkley, 183 N.C. 720, evidence of a dying declaration was admitted, although the deceased became too weak to recite all the circumstances relating to the homicide. In the absence of a cross-examination such declarations are often incomplete; but after all they are only evidence to be considered, weighed, and passed upon by the jury, the final arbiter of all issues of fact. The admission of this evidence conformed to the rules pointed out in several of our decisions.
After the examination of G. F. Hunsucker, the State rested its case and the prisoner in pursuance of a previous request was permitted to recall the sheriff for further cross-examination. At the conclusions of his testimony the prosecution asked permission to examine J. F. Tice, who testified as to the circumstances under which the prisoner was shot and arrested several days afterwards near the line between Stanly and Cabarrus. The request was granted and the prisoner excepted to the examination of Tice on the ground that the State had previously closed its case. Whether the evidence objected to should be introduced was a matter to be determined in the sound discretion of the court and in the absence of abuse the exercise of which discretion is not reviewable. S. v. Davidson, 172 N.C. 944; S. v. King,84 N.C. 737; S. v. Haynes, 71 N.C. 79; S. v. Rash, 34 N.C. 382.
On cross-examination the prisoner asked Tice the questions, "When you did get up there (where the homicide occurred) the sheriff told you *Page 22 
to stay at White Store and keep the crowd back for him, didn't he? Didn't he deputize you for that purpose Saturday afternoon?" It was proposed to show that the sheriff had deputized the witness to prevent the crowd from going to Henry Collins's because he had information that the prisoner was ready to give himself up, and that the witness disobeyed the sheriff's instructions and went in a car with four armed men while the sheriff was there and caused the prisoner to flee.
Upon the principle already stated this evidence was not competent on the question of flight; and if intended as an impeaching question it is not ground for a new trial. Tice was himself a public officer, having occupied the position of constable for eight years. It is evident from his testimony that he was acting in the discharge of official duties and that when he went to Henry Collins's house he did not know the sheriff was there.
Exceptions 10, 15, and 16 are addressed to the court's refusal to sustain the prisoner's motion for nonsuit as to the charge of murder in the first degree and in declining the instruction that there was no evidence of murder in the first degree and that a verdict therefor should not be returned.
The basis of these exceptions is the contention that at the time he shot the deceased the prisoner was urged on by passion aroused by the unprovoked assault of the deceased and that sufficient time had not elapsed for the "passion to subside and reason to reassume her dominion — that is, for premeditation and deliberation." Under our decisions the question of cooling time is ordinarily one of law and only the existence or nonexistence of the facts controlling its application in a given case is for the jury. S. v. Sizemore, 52 N.C. 206; S. v. Moore, 69 N.C. 267; S.v. Merrick, 171 N.C. 788. The question frequently depends upon the nature of the prosecution and the facts disclosed by the evidence. It has been held, for instance, that an interval of two or three minutes, or the prisoner's absence of "no time" is not sufficient; but that an hour is more than sufficient, and a half-hour or even fifteen minutes may be sufficient for passion to subside and reason to resume its sway. S. v. Norris,2 N.C. 430; S. v. Moore, supra; S. v. Savage, 78 N.C. 520;S. v. Williams, 141 N.C. 827. In S. v. Merrick, supra, the question of cooling time fixed by the witnesses was too indefinite and uncertain for a direct ruling as to manslaughter, and it was referred to the jury for final determination.
In the case before us there was evidence that the time intervening between the first combat and the fatal shot was three-quarters of an hour, a half-hour, and "a little while." Under these circumstances the question was submitted to the jury who rejected the prisoner's contention and found that between the two periods there had been sufficient *Page 23 
time for the prisoner's exercise of reason and judgment. If, therefore, there was evidence of murder in the first degree the exceptions should be overruled. That there was such evidence is hardly subject to debate. The testimony tended to show ample time for deliberation and premeditation and the statements said to have been made by the prisoner justified the inference of a fixed design to take the life of the deceased. Mary Polk testified that when the prisoner came towards the house from which he took the gun she warned him to go back and he replied, "Mary, I ain't going to let no man beat me over the head like that and get off"; and William Gulledge said that after the shooting had occurred the prisoner went to his house and told him, "No d___d man could jerk him around and get off with it." These and several other circumstances, such as the prisoner's return to the house for the pistol after the ineffectual discharge of the gun, were admissible on the question of a preconceived purpose; and in applying the evidence the presiding judge was careful and minute in impressing the principle that sufficient cooling time must have passed for rational deliberation and premeditation. As to these exceptions we think the prisoner has no just ground of complaint.
The eleventh exception, which relates to the instruction pertaining to the alleged dying declarations of the deceased, is not tenable. We have held that the evidence as to these declarations was competent; and while the court might properly have told the jury to consider this evidence with due caution, the failure to do so in the absence of a special request will not be held for reversible error. We have repeatedly said that as to subordinate features or particular phases of the evidence proper request should be made for appropriate instructions. S. v. O'Neal, 187 N.C. 22.
Exception twelve refers to the statement of certain contentions to which no objection was made during the trial. Bailey v. Hassell, 184 N.C. 450;S. v. Ashburn, supra.
The thirteenth exception is as to an instruction on the question of premeditation and deliberation, the prisoner insisting that no reference is therein made to cooling time or reasonable doubt. In other parts of the charge, however, the jury was particularly and fully instructed upon each of these questions, and the principle is established that the entire charge of the judge and not isolated and detached paragraphs should be considered in determining whether there is error prejudicial to the appellant. S. v.Wentz, 176 N.C. 745; S. v. Wilson, ibid., 751.
Refusal to give the following instruction is assigned as ground for the seventeenth exception: "If the acts of the defendant are capable of two inferences, one criminal and the other not, the law requires you to place an innocent construction upon his conduct." In relation to *Page 24 
the circumstances shown at the trial the legal proposition introduced in the prayer is incorrect. An instruction similar in its essential features was disapproved and the reasons therefor assigned in S. v. Brinkley, supra. Exception fourteen obviously requires no discussion and the others are formal.
We have endeavored to give this appeal our careful and deliberate consideration. The evidence reveals circumstances which may reasonably be construed as the basis of the defense set up and relied on by the learned and diligent counsel who were appointed to represent the prisoner; but there was also abundant evidence to support the contentions of the State, and under comprehensive instructions the testimony was sumitted [submitted] to and determined by the jury. We find no error. Let this be certified as provided by law.
No error.