STATE v. LIVINGSTON BROWN.

(Filed 15 January, 1965.)

**1. Homicide § 15—**

In order for a declaration to be competent as a dying declaration the declarant must have been in actual danger of death at the time of making the declaration, the declarant must have been in full apprehension of impending death, and death must have ensued.

**2. Same—**

That declarant at the time of making the declaration was then presently conscious of impending death need not be established by a statement of declarant to that effect but may be inferred from the surrounding circumstances.

STATE *v.* BROWN.

**3. Same—**

Consciousness of impending death as an essential element of admissibility of a declaration is satisfied if declarant believes he is going to die, but it is not required that he should have given up all hope of survival or should consider himself to be in the very act of dying.

**4. Same—**

The admissibility of a declaration as a dying declaration is a question to be determined by the trial judge, and when the judge admits the declaration his ruling is reviewable only to determine whether there is evidence tending to show the facts essential to support it.

**5. Same— Evidence held sufficient to support finding that declarant believed she was facing impending death.**

Declarant was admitted to the hospital with severe burns over about 70 per cent of her body from which she died some 25 hours thereafter. The evidence disclosed that her physician told her he thought she would be all right (which was not an honest statement), that declarant stated she did not know whether she was going to make it or not, but also that declarant requested that the sheriff's department be called in a hurry because she did not know how long she would be able to talk, that she told the nurse that she felt she had been spared in order to tell someone about the incident, and that, upon spitting up blood, she said that her mother had told her if anyone ever swallowed fire it would kill them. *Held:* The facts and circumstances in evidence are sufficient to support the court's finding that declarant at the time of making the declarations believed she was facing impending death.

**6. Homicide § 14; Criminal Law § 61—**

It is competent to show in evidence that a track of a mud grip tire on the right and the track of a tire of a regular tread on opposite side were found at the scene of the crime and that defendant's car had a mud grip tire on the right rear and a regular tire on the opposite side.

**7. Homicide § 20—**

The dying declaration of the victim that defendant had poured gasoline on her and set her afire, together with evidence that defendant had purchased a half gallon of gasoline in containers, that a broken half gallon fruit jar with the odor of gasoline in it, a match book cover, matches, and items that had been burned were found at the scene, together with evidence tending to identify the tire tracks at the scene as those of defendant's car, *held* sufficient to overrule defendant's motion for nonsuit.

**8. Criminal Law § 159—**

Assignments of error not brought forward and discussed in the brief are deemed abandoned. Rule of Practice in the Supreme Court No. 28.

APPEAL by defendant from *Crissman, J.,* June 1964 Session of RANDOLPH.

Criminal prosecution on an indictment charging murder in the first degree. Before defendant entered a plea, the solicitor for the State

announced in open court that he would seek only a verdict of guilty of murder in the second degree or manslaughter, as the facts might appear.

Plea: Not guilty. Verdict: Guilty of murder in the second degree.

From a judgment of imprisonment, defendant appeals.

*Attorney General T. W. Bruton and Deputy Attorney General Harry W. McGalliard for the State.*

*Archie L. Smith for defendant appellant.*

PARKER, J. The State's evidence shows these facts: Sometime after 1:00 a.m. on 16 March 1964, Lucille Currie alone came to the home of Robert H. Seawell, which is situate about six and one-half miles east of the town of Asheboro on what is called the Wagon Wheel Road. She awakened Seawell and his family. According to Seawell's testimony, her body and face were burned, and she had no clothes on "from here up (indicating)." She was given a sheet and wrapped herself up. Seawell called an ambulance, which arrived in about twelve minutes, and she was carried to Randolph Hospital in Asheboro.

The State and defendant stipulated that Lucille Currie was admitted in Randolph Hospital at 2:15 a.m. on 16 March 1964, and died in that hospital at 3:00 a.m. on 17 March 1964.

Defendant assigns as errors the admission over his objections of testimony of Dr. Luke Query, of Mrs. Nora Pratt, of Paul W. Scott, of Blease Garner, and of J. C. Dawkins, as to declarations made by Lucille Currie in Randolph Hospital, which were admitted by the court as dying declarations. These assignments of error are supported by appropriate exceptions. The facts necessary for an understanding of these assignments of error are set out below.

When Lucille Currie was admitted in Randolph Hospital, she was suffering from second and third degree burns on about 70% of her head and body. These burns caused her death in less than twenty-five hours after her admission in the hospital.

J. C. Dawkins, sergeant with the Asheboro Police Department, received a call from Randolph Hospital, according to his testimony, around 1:45 a.m. on 16 March 1964, and went to the hospital. He saw Lucille Currie in the emergency room of the hospital. A nurse and two ambulance attendants were there with her. She was lying on a table with a sheet over the top part of her body. He could see her hip and the backbone of her shoulder and back of her head. She was burned very badly. The skin was coming off, and her ears were practically burned off. He arrived at the hospital before Dr. Luke Query did. He told

Lucille he would have to call the Sheriff's Department since it happened out of town. She told him to please hurry that she did not know how long she would be able to talk. She told him her boy friend, Livingston Brown, had poured gasoline on her and set her on fire, that it happened off the Wagon Wheel Road. He had her repeat the statement when he saw how serious her condition was. Deputy Sheriff Blease Garner came to the hospital and was in the emergency room part of the time he was talking to Lucille. After two o'clock he left the hospital with Deputy Sheriff Garner, went to Livingston Brown's home, and arrested him.

Dr. Luke Query is a practicing medical doctor in Asheboro. He saw and treated Lucille Currie in Randolph Hospital for second and third degree burns on about 70% of her head and body. In his opinion she died as a result of these burns. She was aware of the fact that she was seriously burned, but he does not know that she was aware of the fact that she was going to die. She asked him if she was going to live. He did not give her an honest answer. He told her he thought she would be all right. He asked her how it was done. She replied, "My boy friend did it." She did not state his name.

Mrs. Nora Pratt is a licensed practical nurse, and from 3:00 p.m. until 11:00 p.m. on 16 March 1964 she was in charge of the floor in Randolph Hospital on which Lucille's room was situate. When she came on duty, she went straight to her room. There were other patients in the room and she treated these patients in addition to Lucille. There was an aide on duty with her. Lucille was in a critical condition. Over 70% of her body was burned. She talked to Lucille about 3:10 p.m. Lucille said: "I feel the Lord has spared me for a reason — to tell someone — about the incident." Mrs. Pratt testified as follows:

> "She asked me if I knew Livingston Brown, and I didn't answer her. She said, 'He did it.' She said, 'We had been out together, and on the way back,' she said, 'he poured gasoline on me and set me afire' she said, 'I ran and fell in a hole.' She said, 'I laid there' and that is all."

Lucille died at 3:00 a.m., about twelve hours thereafter.

Paul W. Scott, a deputy sheriff of Randolph County, talked with Lucille about 11:00 a.m. on 16 March 1964, and also about 2:00 p.m. on the same day. All he could see of her were her arms and neck and head. They were badly burned. Her left ear was burned about off, and her hair was burned off. On his second visit to her, he asked her how she was feeling, and she replied that she did not know if she was going to make it or not. Scott testified:

"She told me Livingston Brown came to her house somewhere around 11 o'clock. She stated she knew exactly the time. On Sunday night, the 15th. She said he came in and told her he was going to kill her; that he hit her in the mouth; that he hit her in the stomach and took her by the arm and took her out to the car. This was at her residence over at Mr. Shaw's house here in Asheboro. She said he got her by the arm and forced her to get into the car; and that while going toward Franklinville he said he was going to kill her and nobody was going to know anything about it.

"She told me that when they got down to the Wagon Wheel Road he told her this was far enough and to get out of the car. They walked a short ways. She said he unscrewed a cap of a jar of gasoline and poured it on her and struck a match to it. She said she pulled off her coat and started running down across the field. That while she was running she heard him laughing; and she said she laid down in the hollow in some water and mud until she heard his car start up and leave, then she went back to the residence for help. She stated she was on fire."

Scott also testified that she told him the same story when he saw her at 11:00 a.m.

Blease Garner is a deputy sheriff of Randolph County. He saw Lucille in the emergency room in Randolph Hospital shortly after 2:00 a.m. on 16 March 1964. Dr. Luke Query came in the emergency room about the same time he did. He talked with Lucille in the hospital on four or five different occasions. He first talked with her upon his arrival in the emergency room. He asked her what had happened, and, according to his testimony, she replied as follows:

"She stated that Livingston Brown came to her house around 11 o'clock p.m. March 16, 1964. [It is apparent from the record that it was about 11:00 p.m. 15 March 1964.] She stated she was not sure that this was the correct time, that it might have been a little later than this, that she was just making a guess about the time; and told her he was going to kill her. She said he came into the house, hit her in the mouth and in the stomach, that he was talking all the time, 'I am going to kill you. No one is going to see me. No one will know that I did it.' And he got her by the arm and forced her into the car, and stated that he believed she had been two-timing him, that was why he was going to kill her. She said that they went down the Wagon Wheel Road near Franklinville and pulled into a side road, they got out and walked approxi-

mately 75 yards and he said, 'I guess this is far enough.' That during the time he was holding her by the arm and carrying a half gallon jar in the other. He poured gasoline on her head and stuck a match to her, pulled off her coat and she ran across the field and laid down in mud and water and pulled her clothes off. She waited until his car left in about ten minutes, she said she then went to some white people's house and asked for help; that they called an ambulance."

About 1:15 a.m. on 17 March 1964 he went to Randolph Hospital and talked again to Lucille. She died within less than two hours after this conversation. He testified:

"While I was talking to her she got sick on her stomach and she started to throw up some, and there was some blood in it. At that time she said, 'See that blood, I must have swallowed some of the fire. — My mother told me that if — My mother told me if anyone ever swallowed fire it would kill them. Why did he do that? He couldn't prove I was running around on him.' I then asked her if she could remember anyone that could have seen them together that night, she replied, 'I told you he was making sure no one would see us together.' At this time she got real sick on her stomach and I called a nurse and I left at that time."

The conditions essential to admissibility of dying declarations relating to the act of killing and the circumstances attending and leading up to the homicide of the declarant are: (1) At the time the declarations were made the declarant must have been in actual danger of death. (2) The declarant must have had full apprehension of a speedy and inevitable death, because all men are mortal, and know it. (3) Death must have ensued. *S. v. Gordon,* 241 N.C. 356, 85 S.E. 2d 322; *S. v. Jordan,* 216 N.C. 356, 5 S.E. 2d 156; *S. v. Collins,* 189 N.C. 15, 126 S.E. 98; *S. v. Laughter,* 159 N.C. 488, 74 S.E. 913; Wigmore on Evidence, 3rd Ed., Vol. V, § 1441. "For the sake of completeness, although not important in the case at bar, we might add to this a fourth condition that the declarant, if living, would have been a competent witness to testify as to the matter." *S. v. Gordon, supra; S. v. Layton,* 204 N.C. 704, 169 S.E. 650. "It follows, also, that the expectation must be of a *speedy* death. * * * Nevertheless, no definition of time can be fixed; the determination must vary with each case, after all the circumstances are considered." Wigmore on Evidence, 3rd Ed., Vol. V, § 1441.

It is the condition of mind of the declarant which determines the admissibility of this class of proof, and if the declarant believes his death

from his injuries is inevitable, his declaration will not be excluded because his physician told him he would be all right. *S. v. Layton, supra; S. v. Caldwell,* 115 N.C. 794, 20 S.E. 523; *S. v. Mills,* 91 N.C. 581; 40 C.J.S., Homicide, § 290, p. 1255.

The admissibility of a declaration as a dying declaration is a question to be determined by the trial judge. When the trial judge admits the declaration, on appeal, the ruling of the trial judge is reviewable only to determine whether there is evidence tending to show facts essential to support the trial judge's ruling. *S. v. Rich,* 231 N.C. 696, 58 S.E. 2d 717; *S. v. Thompson,* 226 N.C. 651, 39 S.E. 2d 823; *S. v. Jordan, supra.* In *S. v. Jordan, supra,* it is said: "That some latitude must be given to the trial court in this matter is a necessity of administration * * * ."

*S. v. Bagley,* 158 N.C. 608, 73 S.E. 995, is a case in which the defendant appealed from a judgment of death based on a verdict of guilty of murder in the first degree. Many of defendant's assignments of error related to the competency of dying declarations. The evidence in the case showed that the doctor, who was present with deceased when he died, told him he was in a critical condition and was likely to die, and that if there was any message he wanted to leave, he had better do so. The deceased then said the defendant shot him. The Court said in its opinion:

"Dying declarations are admissible in cases of homicide when they appear to have been made by the deceased in present anticipation of death. It is not always necessary that the deceased should declare himself, that he believes he is about to pass away, but all the circumstances and surroundings in which he is placed should indicate that he is fully under the influence of the solemnity of such a belief.

\*      \*      \*

"We think the evidence indicates clearly that the deceased fully realized not only that his death was sure, but that it was also near, and that the court properly admitted his declaration."

In *S. v. Rich, supra,* there was testimony tending to show that a doctor, after examining the declarant, informed her she was approaching impending death, and that thereupon the declarant told him that she had been beaten by her husband and kicked in the abdomen, and that death resulted from such injury. The Court held that the evidence was sufficient to sustain the trial court's ruling admitting the declaration in evidence as a dying declaration, although the declarant herself made no statement that she believed she was about to die.

*S. v. Watkins,* 159 N.C. 480, 75 S.E. 22, is a case in which the declarant made a statement, just before an operation for gunshot wounds, after physician's advice that he did not have more than one chance in a hundred of living, that the officer at Black Mountain shot him. This declaration was held competent as a dying declaration. The Court said: "Surrounding circumstances are sufficient to show consciousness of approaching death and to lay the foundation for a dying declaration."

In Wigmore on Evidence, 3rd Ed., Vol. V, § 1442, it is said:

"In ascertaining this consciousness of approaching death, recourse should naturally be had to all the attending circumstances.

"It has been contended that only the *statements of the declarant himself* could be considered for this purpose; or, less broadly, that the *nature of the injury alone* could not be sufficient, *i. e.*, in effect, that the declarant must have shown in some way by conduct or language that he knew he was going to die. This, however, is without good reason. We may avail ourselves of any means of inferring the existence of such knowledge; and, if in a given case the nature of the wound is such that the declarant must have realized his situation, our object is sufficiently attained.

"Such is the settled judicial attitude.

*      *      *

"No rule can here be laid down. The circumstances of each case will show whether the requisite consciousness existed; and it is poor policy to disturb the ruling of the trial judge upon the meaning of these circumstances."

In Stansbury's North Carolina Evidence, 2d Ed., § 146, p. 361, note five states:

"*State v. Stewart,* 210 N.C. 362, 186 S.E. 488 (1936). This is the only North Carolina case found since 1798 in which the admission of a dying declaration was held erroneous on the ground of an insufficient apprehension of death."

Considering all the circumstances surrounding the making of all the declarations by Lucille Currie in respect to the facts attending and leading up to her burns, which resulted in her death, we think that the evidence clearly shows that the nature of the severe burns on about 70% of her head and body, which resulted in her death in about twenty-five hours after she was admitted in Randolph Hospital, was such that at the time of making all the declarations she must have fully

realized that her death was certain, and also near, and that she was speaking in the hush of its impending presence, that her consciousness of her speedy and approaching death from her burns is plainly shown when she said to Sergeant Dawkins shortly after her arrival in the emergency room in Randolph Hospital, after he said he would have to call the Sheriff's Department since it happened out of town, to please hurry that she did not know how long she would be able to talk, is further shown by her telling Mrs. Nora Pratt, a licensed practical nurse, at 3:10 p.m. in the hospital: "I feel the Lord has spared me for a reason — to tell someone — about the incident," and is also shown by her saying to Blease Garner about 1:15 a.m. on 17 March 1961, after she had gotten sick on her stomach and thrown up some blood, "See that blood, I must have swallowed some of the fire. — My mother told me that if — My mother told me if anyone ever swallowed fire it would kill them," and that all these attendant circumstances support the trial judge's rulings of competency of these declarations as dying declarations, and his admission of them in evidence. We think the requisite consciousness on her part of speedy and imminent death from her burns existed during the time that she made all of these declarations, although she did ask Dr. Query if she was going to live, a question that perhaps most any person in her condition would have asked in the hope of a comforting answer, and his reply that he thought she would be all right, which he testified was not an honest answer, and although about 2:00 p.m. on 16 March 1964 she told Paul W. Scott, a deputy sheriff, that she did not know if she was going to make it or not; and that the question she asked Dr. Query and the statement she made to Paul W. Scott do not amount to a subsequent change of her consciousness of the certainty of imminent death by the recurrence of a hope of life. "It is not necessary that the declarant should have given up *all* hope of survival, or that he should consider himself to be in the very act of dying. It is enough if he *believes* that he is going to die," Stansbury, N. C. Evidence, § 146, p. 359.

In addition to the facts above stated, the court offered additional evidence as follows: Between 10:00 and 12:00 p.m. on 15 March 1964 defendant drove up in an automobile to a filling station where James Wright was working, handed him a half gallon glass fruit jar and said he wanted it filled with gasoline. Wright told him he could not put gasoline in a glass container but he did have quart oil cans. Defendant told him to fill up two of these cans. He did and defendant put them on the floor board of his automobile. Wright asked him if he wanted him to help plug up the holes and defendant said, "I'm in a hurry, I'm going to use this gas in a little bit." Defendant paid him and drove

away. After Lucille Currie was admitted in the hospital, officers found about a hundred yards from the home of Robert H. Seawell on a dirt road leading off the Wagon Wheel Road a broken half gallon glass fruit jar with the odor of gasoline in it, a match book cover, matches, and items that had been burned. At the scene officers found tire tracks which were unusual. There was one track of a mud grip tire on the right and another tire track of a regular tread on the opposite side. Officers found sitting behind defendant's house an automobile which had a mud grip tire on its right rear and a regular tread tire on the opposite side. We think the evidence in respect to the tire tracks was properly admitted in evidence. *S. v. Young*, 187 N.C. 698, 122 S.E. 667. Defendant's assignments of error to the denial of his motion for non-suit at the close of all the evidence is overruled.

We have examined all of defendant's remaining assignments of error which have been brought forward and discussed in his brief, and they are overruled. The assignments of error which have not been brought forward and discussed in his brief are deemed to be abandoned. Rule 28, Rules of Practice in the Supreme Court, 254 N.C. 783, 810. No error has been shown that would warrant disturbing the verdict and judgment below.

No error.