STATE v. DENNIS McDANIEL.

(Filed 2 February, 1968.)

**1. Homicide § 15—**

In order for a declaration to constitute a dying declaration the declarant must, at the time of the making of the statement, have full apprehension of his danger of imminent and inevitable death, and a mere showing that the declarant was at the point of death and in great agony is insufficient.

**2. Criminal Law §§ 75, 76—**

The admission, over objection, of inculpatory statements made by defendant to police officers without a hearing of evidence by the trial court to determine the voluntariness of the statements, and the admission, over objection, of a knife identified by the accused, while in the custody of police officers and without being advised of his rights, as the knife with which he stabbed the deceased, while ordinarily reversible error, *is held* not to warrant a new trial in this case, since the defendant testified in his own behalf that he intentionally stabbed the deceased with the knife.

**3. Criminal Law § 169—**

The admission of evidence over objection is ordinarily rendered harmless when the defendant thereafter testifies to evidence of the same import.

**4. Same; Criminal Law § 76—**

The rule that a conviction based upon an incompetent confession cannot be saved by sufficient evidence *aliunde* the confession does not apply when the defendant testifies in his own behalf to the same facts stated in such confession.

**5. Criminal Law § 85—**

Where defendant takes the stand in his own behalf and introduces the details of his criminal record, including a conviction for assault, as substantive evidence of his innocence, the solicitor is entitled to cross-examine the defendant as to the nature of the weapon used by defendant in the prior assault.

BOBBITT AND SHARP, JJ., concur in result.

APPEAL by defendant from *Bailey, J.,* at the January 1967 Criminal Session of COLUMBUS.

Upon an indictment, proper in form, the defendant was tried for the murder of Chester Leggett and was found guilty of murder in the second degree. He was sentenced to imprisonment in the State Prison for 20 to 30 years. The only assignments of error relate to the denial of his motion for a directed verdict of not guilty and to the admission of evidence over his objection.

Evidence introduced by the State, without objection, is to the following effect:

On Sunday, 4 September 1966, the defendant and Leggett had an altercation which began in a parked automobile in which they,

two women and another man were sitting in front of the home of a mutual friend. Leggett and his woman companion, whom the defendant had also dated on occasion, got out of the car, the defendant remaining therein. Leggett called back to the defendant and told the defendant that if he had anything to "settle" to come on down the road and settle it with him. Thereupon, the defendant got out of the car with a knife in his hand and went down the road toward Leggett. They began to tussle. Leggett grabbed the defendant's wrist and they fell to the ground. He could not take the knife from the defendant and got up and told the defendant to "go on," and that "he didn't want to mess with him." Leggett started down the road and the defendant ran up behind him. Leggett picked up a stone and they began to tussle again. The defendant still had the knife. Leggett dropped the stone. They resumed the struggle and again fell to the ground. When they got up, Leggett was backing away down the road and the defendant was walking toward him with the knife. Leggett then picked up a piece of plank about three feet long and two inches wide. Swinging this in front of him, he continued to back away from the defendant until he (Leggett) backed into a wire fence. Leggett did not hit the defendant with the piece of plank. Witnesses saw the defendant go up to Leggett and saw his right arm go up and down three times. Leggett fell against the fence and then began to run down the road. Leggett and the defendant were 38 and 65 years of age, respectively, Leggett being substantially taller and heavier.

The foregoing fight occurred at approximately 3 p.m. About 4:15 p.m., in response to a call, Assistant Police Chief Heye went to the scene and found Leggett lying on the ground about one block from where the fight occurred. Leggett's shirt was full of blood and he appeared to be in agony. The officer observed three stab wounds or cuts, one in the middle of the chest. After a brief conversation with Leggett, the officer carried him to the hospital where, upon arrival, he was pronounced dead by the examining physician. At the trial it was stipulated that the cause of Leggett's death was a stab wound in the center of his chest.

Over objection, Officer Heye was permitted to testify that when he found Leggett he asked him three times who had cut him and, on the third time, Leggett replied, "Mr. Dennis" (the defendant).

Through a series of questions, interspersed with objections and motions to strike, all of which were overruled, the State introduced the testimony of Officer Heye to the following effect:

After Leggett had been pronounced dead on arrival at the hospital, Officer Heye, by radio, instructed Officer Fipps to pick up the defendant and take him to the police station in Chadbourn, which

Officer Fipps did. Upon arrival at the police station from the hospital, Officer Heye found the defendant there and transported him to the jail in Whiteville, where the coroner was waiting, the coroner having gone to the hospital before Officer Heye left it. During the ride from the police station in Chadbourn to the jail in Whiteville, Officer Heye did not interrogate the defendant, but the defendant "persisted" in telling Officer Heye what had happened, so the officer "just let him go ahead and talk." The defendant told Officer Heye that he had cut Leggett with a knife and meant to do it, intending to put a stop to Leggett's "picking and staying in behind him all the time." Upon arrival at the jail in Whiteville, Officer Heye asked the defendant where he had left his knife. The defendant replied that he had left it on a table between the sink and the refrigerator in the house of Joe Collins, in front of which house the fight began. Officer Heye then instructed Officer Fipps to go to the Collins residence and get the knife, which Officer Fipps did, finding it on the table in the location so described by the defendant.

Officer Fipps, over objection, testified that he found a knife, as described to him by Officer Heye in the latter's instructions, in the place so specified. Over objection, the knife was introduced in evidence. It was a small paring knife with a wooden handle, approximately six inches long. It was then in the same condition as when offered in evidence. Officer Fipps also testified that earlier, pursuant to his original instructions by radio from Officer Heye, he had gone to the scene of the fight and found the defendant in the road. He and two other officers, who were with him, asked the defendant to ride with them down to the police station, telling him they wanted to talk with him. He got in the police car and accompanied these officers to the police station in Chadbourn, where he was when Officer Heye arrived from the hospital. There was no evidence of any statement by the defendant to these officers or by them to him.

There was no evidence that Officer Heye, or any other officer, at any time advised the defendant of his constitutional rights to remain silent and to have an attorney or of any other constitutional right. No examination of any officer was conducted in the absence of the jury with reference to the voluntary or involuntary nature of statements by the defendant. The court made no findings of fact with reference thereto, merely overruling, without comment, objections by the defendant to questions propounded to the officers with reference to the above statements and to the finding of the knife.

Following the above testimony by the police officers, counsel for the defendant cross examined each of the officers. Upon cross examination, Officer Heye testified that he had "a very brief conversation" with the defendant at the Chadbourn police station and that the de-

fendant began to tell him what had happened. Thereupon, Officer Heye told the defendant that they had to go over to Whiteville and the coroner was waiting for them at the jail. On the way to the jail the defendant "volunteered to tell him what happened." The defendant was nervous and wanted to talk about what had taken place and Officer Heye "let him go ahead and talk." During the course of that conversation, the defendant told Officer Heye that he and Leggett had had a fight, and also told him that he (the defendant) had "stabbed him" (Leggett). During this conversation on the way to Whiteville, the defendant told Officer Heye where he could find the knife.

On cross examination, Officer Fipps testified that, pursuant to instructions from Officer Heye, he went to the scene of the fight, which was in front of the Joe Collins residence and, finding the defendant there, requested him to go to the police station because the officers "wanted to talk to him." He did not place the defendant under arrest at any time or inform him why the officers wanted to talk to him. He had no other conversation with the defendant whatever. The defendant did not object to being taken to the jail in Whiteville by Officer Heye. He made no inquiry as to why he was being taken to Whiteville.

The defendant testified in his own behalf. The substance of his testimony on direct examination was:

Leggett, who was much younger and much larger than the defendant, without provocation, jumped on the defendant as they were walking together down the road from where they had gotten out of the automobile, began choking and beating the defendant and "had him down." Thereupon, the defendant, being scared that Leggett would kill him, as he said he was going to do, stabbed Leggett. Leggett then got up and the defendant put his knife back in his pocket. Thereupon, Leggett got a rock and tried to hit the defendant with it. The defendant backed off. Leggett dropped the rock and picked up the piece of plank. The defendant then pulled his knife out of his pocket again to keep Leggett from hurting him. Leggett was trying to hit him with the piece of plank. After Leggett dropped the plank and ran, the defendant saw Leggett no more. He went to the police station with Officer Fipps. Upon being asked when he found out that he was under arrest, the defendant replied that he "never found out." He went to the Whiteville jail with Officer Heye. On the way Officer Heye asked him where the knife was and the defendant told him where to find it on the table in Joe Collins' house. He had previously been arrested and convicted for public drunkenness five or six times, and in 1963 he had been given a suspended sentence for "assault with a deadly weapon." He did not have his knife in his hand when he

got out of the automobile and walked down the road toward Leggett before the start of the fight.

On cross examination the defendant testified:

He and Leggett were not quarreling over Leggett's woman companion. They had had no quarrel at all prior to Leggett's "jumping on him" as they walked together down the road. While Leggett had the defendant down on the ground, with one hand on his neck and hitting him with the other, the defendant reached in his pocket, got the knife and stabbed Leggett. He then put his knife back in his pocket and did not take it out again until Leggett picked up the piece of plank and started swinging it. Then Leggett backed up against the fence, dropped the piece of plank and ran. He does not know where he stabbed Leggett or how many times. He did not stab Leggett while the latter was backed up against the fence, but while Leggett had him down on the ground. On the way to Whiteville he told Officer Heye that he had stabbed Leggett and where the officer could find the knife.

Also on cross examination the defendant identified the knife in evidence as the one he "stabbed Chester Leggett with," and, over objection, in response to a question by the solicitor, he testified that his former suspended sentence for "assault with a deadly weapon" was for his use of "a pocket knife."

*Attorney General Bruton and Assistant Attorney General Goodwyn for the State.*

*John A. Dwyer for defendant appellant.*

LAKE, J. It was stipulated in the course of the trial below that Chester Leggett is dead and that the cause of his death was a stab wound in the chest. The defendant, himself, testified that in the course of a fight he intentionally stabbed Leggett with a knife, identifying the knife. The evidence of the State is that Leggett was found dying in the vicinity of that fight, approximately one hour after it occurred. The State also introduced evidence tending to show that the defendant was the aggressor in the fight and that he stabbed Leggett while the latter was backed up against a fence in an effort to retreat from the fight. There was no error in the denial of the defendant's motion for a directed verdict of not guilty on the charge of second degree murder. The defendant's testimony that he stabbed Leggett in self defense presented a question for the jury which did not accept his version of the occurrence.

It was error to permit Officer Heye, over objection by the defendant, to testify that the deceased told him the defendant had cut

him. This was obviously hearsay. The defendant was not present when the statement was made. It does not qualify as a dying declaration for the reason that there is insufficient evidence to show that Leggett then had "full apprehension of his danger" of imminent and inevitable death. *State v. Dunlap,* 268 N.C. 301, 150 S.E. 2d 436; *State v. Brown,* 263 N.C. 327, 139 S.E. 2d 609; *State v. Bright,* 215 N.C. 537, 2 S.E. 2d 541; Stansbury, North Carolina Evidence, 2d Ed., § 146. While such apprehension on the part of the deceased may be shown by circumstances, *State v. Watkins,* 159 N.C. 480, 75 S.E. 22; 26 Am. Jur., Homicide, § 421, it is not shown by mere proof that the deceased was actually at the point of death and in great agony, which is all that is shown upon this point in this record.

There was also error in allowing the State, over objection, to introduce in evidence statements made to Officer Heye by the defendant, and the knife, which was found by the officers as the result of such statements. The admission of the statements was error, not because the record shows affirmatively that they were incompetent under the *Miranda* Rule, but because the procedure required by our own rule for determining their competency was not followed. The admission of the knife was error both because of the *Miranda* Rule and because of our own rule.

In *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, the Supreme Court of the United States established the following rule which, being an interpretation by that Court of the Fifth and Fourteenth Amendments to the Constitution of the United States, is binding upon us:

"To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree

to answer questions or make a statement. *But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.*" (Emphasis added.)

Obviously, the defendant was in custody, within the meaning of the *Miranda* decision, when, in response to a question by Officer Heye, he told Officer Heye where to find the knife which was introduced in evidence as the State's Exhibit No. 1. There is no suggestion whatever in the record that, prior to this interrogation and response, the defendant was warned of his constitutional rights. It follows that the knife itself and the testimony of the officers that they found it in the place designated by the defendant were not admissible in evidence against him when offered by the State. *State v. Mitchell*, 270 N.C. 753, 155 S.E. 2d 96.

In due time, the defendant objected to testimony by Officer Heye concerning statements made by the defendant to him enroute from the police station in Chadbourn to the jail in Whiteville. Without conducting any examination concerning the voluntary or involuntary nature of the statements, without sending the jury from the courtroom and without making any finding of fact upon which a conclusion as to the voluntary or involuntary nature of the statements could be based, the court overruled the objection and permitted the officer to testify that the defendant said that he had intentionally cut the deceased with a knife.

In *State v. Gray*, 268 N.C. 69, 150 S.E. 2d 1, we said:

"When the State proposes to offer in evidence the defendant's confession or admission, and the defendant objects, the proper procedure is for the trial judge to excuse the jury and, in its absence, hear the evidence, both that of the State and that of the defendant, upon the question of the voluntariness of the statement. In the light of such evidence and of his observation of the demeanor of the witnesses, the judge must resolve the question of whether the defendant, if he made the statement, made it voluntarily and with understanding. [Citations omitted.] The trial judge should make findings of fact with reference to this question and incorporate those findings in the record."

We again stated this rule in *State v. Ross*, 269 N.C. 739, 153 S.E. 2d 469. To the same effect is *State v. Barnes*, 264 N.C. 517, 142 S.E. 2d 344, where a new trial was granted because the trial judge had not made findings of fact with reference to whether a confession introduced in evidence over the defendant's objection was voluntary.

Nothing else appearing, these errors in the admission of evidence

would require a new trial. However, the defendant elected to testify in his own behalf and his testimony was such as to cure the errors above noted by rendering them harmless. The evidence of the State so erroneously admitted was for the sole purpose of proving that the defendant intentionally cut or stabbed the deceased with the knife introduced in evidence. The defendant, himself, testified that he did intentionally stab the deceased, that he did so with that knife, which he subsequently placed on the table in the residence of Joe Collins, and that he later told Officer Heye where to find the knife.

In *State v. Adams*, 245 N.C. 344, 95 S.E. 2d 902, Denny, J., later C.J., speaking for the Court, said:

> "Exceptions by the defendant to evidence of a State's witness will not be sustained where the defendant or his witness testifies, without objection, to substantially the same facts. *State v. Matheson*, 225 N.C. 109, 33 S.E. 2d 590.
>
> "Likewise, the admission of evidence as to facts which the defendant admitted in his own testimony, cannot be held prejudicial. *State v. Merritt*, 231 N.C. 59, 55 S.E. 2d 804."

The rule so stated is well established in this and other jurisdictions. *State v. Dunlap, supra; State v. Conner*, 244 N.C. 109; 92 S.E. 2d 668; *State v. Minton*, 234 N.C. 716, 68 S.E. 2d 844; 31 A.L.R. 2d 682; *State v. Hudson*, 218 N.C. 219, 10 S.E. 2d 730; *State v. Bright, supra; State v. Cade*, 215 N.C. 393, 2 S.E. 2d 7; Strong, N. C. Index 2d, Criminal Law, § 169; 5 Am. Jur. 2d, Appeal and Error, § 806; 5A C.J.S., Appeal and Error, §§ 1731 and 1732.

The admission of the testimony of Officer Heye as to the statement by the deceased, identifying the defendant as the person who had cut him, the admission of the testimony of Officer Heye concerning the admissions by the defendant and the defendant's directions as to where the knife was to be found, and the admission of the knife, itself, in evidence do not, therefore, entitle the defendant to a new trial under the rule heretofore established by the decisions of this Court.

We are not inadvertent to the Court's footnote 33 to the opinion in the *Miranda* case, *supra*. That footnote is to the effect that when a conviction is based in part upon a confession, admitted in evidence over the defendant's objection and inadmissible because obtained by police officers in violation of the *Miranda* rule, the conviction and resulting judgment are not saved by the fact that the record contains other evidence which is competent and ample, without consideration of the confession, to support the conviction. Obviously, a confession does not cease to be prejudicial and its improper admission does not

fall into the category of harmless error merely because it is not the only evidence of guilt. For example, the presence in the record of testimony of an alleged eye-witness, or of evidence of other circumstances, from which guilt could be inferred, would usually be less convincing than the defendant's own confession, and so would not convert the improper admission of such confession into harmless error. The defendant's own direct testimony upon the witness stand, in response to questions put to him by his own counsel, is a different matter. When he takes the witness stand and testifies to the same facts as those contained in the State's evidence to which he objects, it is his own testimony, not the extra-judicial statement improperly allowed in evidence, which establishes those facts and the extra-judicial statement becomes inconsequential. Having now testified to the same facts under oath, he cannot be heard to say he has been prejudiced by the erroneous admission of evidence to the identical effect.

Nor have we overlooked *Fahy v. Connecticut,* 375 U.S. 85, 84 S. Ct. 229, 11 L. Ed. 2d 171. There the Court reversed a conviction on the charge of injuring a public building by painting a swastika upon a synagogue. The ground of reversal was that a paint brush obtained by an unconstitutional search and seizure was admitted in evidence over objection. The Supreme Court of Errors and Appeals of Connecticut sustained the conviction and resulting judgment on the ground that the admission of the brush into evidence, while error, was harmless error. The United States Supreme Court reversed for the reason that, in its view, the inadmissible evidence was, in fact, prejudicial, Justices Harlan, Clark, Stewart and White dissenting. The Chief Justice, speaking for the majority of the Court, said:

> "On the facts of this case, it is not now necessary for us to decide whether the erroneous admission of evidence obtained by an illegal search and seizure can ever be subject to the normal rules of 'harmless error' under the federal standard of what constitutes harmless error. Compare *Ker v. California,* 374 U.S. 23, 10 L. ed. 2d 726, 83 S. Ct. 1623. We find that the erroneous admission of this unconstitutionally obtained evidence at this petitioner's trial was prejudicial; therefore, the error was not harmless and the conviction must be reversed. * * * Obviously, the tangible evidence of the paint and brush was itself incriminating. * * * It can be inferred from this [a quoted finding by the trial judge] that the admission of the illegally seized evidence made Lindwall's [a police officer] testimony far more damaging than it would otherwise have been."

Mr. Justice Harlan, speaking for the minority of four justices, said:

> "This [his discussion of the state court's reasoning] brings me to the question which the Court does not reach: Was it constitutionally permissible for Connecticut to apply its harmless-error rule to have this conviction from the otherwise vitiating effect of the admission of the unconstitutionally seized evidence? I see no reason why not."

In the majority opinion it is noted that, after the admission of the paint brush and a confession (this being before the *Miranda* decision) into evidence, the defendants took the stand, as witnesses in their own behalf, and "admitted their acts," and tried unsuccessfully to establish that the nature of these acts was not within the prohibition of the state statute under which they were charged. The majority noted this as further indication of the prejudicial nature of the improperly admitted paint brush. However, the majority opinion also states that under the Connecticut practice the defendants "were not allowed to pursue the illegal search and seizure inquiry at the trial" and "[t]hus petitioner was unable to claim at trial that the illegally seized evidence induced his admissions and confession." This distinguishes that case from the one now before us. The law of North Carolina, as declared in innumerable decisions of this Court, afforded this defendant the right to stand upon his objection to the admission of the knife and his statements to Officer Heye. He was not compelled to testify as he did. Indeed, he does not contend upon this appeal that he was brought to his decision so to do by the admission of this evidence. Apart therefrom, he may have concluded the other evidence offered by the State, as summarized in our statement of facts, made it advisable for him to testify as he did. We are not required to speculate as to this and, in the absence even of a contention by the defendant to that effect in his brief and oral argument before us, to assume that he took the stand and testified that he stabbed the deceased with this knife under the compulsion of the evidence improperly admitted. His testimony was designed to win an acquittal on the ground of self defense.

In the absence of any decision by the Supreme Court of the United States to the effect that erroneous admission of an unconstitutionally obtained statement by a defendant, and of a weapon found as the result of such statement, may not be cured by the defendant's subsequently testifying in his own behalf to the same facts and identifying in his testimony the State's exhibit as the weapon used by him,

we adhere to our well established rule that such testimony by the defendant makes the trial court's error a harmless one.

On direct examination the defendant testified, in response to questions by his counsel, that he had been arrested and convicted for public drunkenness five of six times and that he recalled being given a suspended sentence on the charge of assault with a deadly weapon, these being the only offenses of which he had been convicted in his 66 years. A defendant charged with a criminal offense may offer evidence of his own good character as substantive evidence tending to show that he did not commit the offense with which he is charged. *State v. Guss,* 254 N.C. 349, 118 S.E. 2d 906; *State v. Reddick,* 222 N.C. 520, 23 S.E. 2d 909. Thus, the defendant was entitled to show, as he did, that in his 66 years he had been convicted only of the offenses named by him in the hope that the jury would infer therefrom that a person with such character as would be indicated from such record would not commit the offense with which he is now charged.

It is equally well settled that ordinarily the State may not introduce evidence of prior like offenses, this not being competent evidence to show the defendant's guilt of the offense now charged. *State v. Gammons,* 258 N.C. 522, 128 S.E. 2d 860; Stansbury, North Carolina Evidence, 2d Ed., § 91. However, when the defendant takes the stand as a witness in his own behalf, he is subject to impeachment just as is any other witness. For that purpose, the solicitor may cross examine him with reference to other offenses for which he has been convicted. *State v. Troutman,* 249 N.C. 395, 106 S.E. 2d 569; *State v. Howie,* 213 N.C. 782, 197 S.E. 611; Strong, N. C. Index 2d, Criminal Law, §§ 84 and 85. This is especially true where, as here, the defendant has testified on direct examination as to his past criminal record as substantive evidence of his innocence and has referred to the identical offense, to which the solicitor's cross examination is directed, as evidence from which the jury should infer his innocence of the present charge. The defendant, having sought thus to have the jury infer from his past record that he is not a man who would commit an offense such as charged in the present indictment, the solicitor is entitled to cross examine him concerning the record so put in evidence by the defendant. Under the circumstances of this case, there was no error in permitting the solicitor, on cross examination, to ask the defendant as to the nature of the weapon used by him (a knife) in the former offense of assault with a deadly weapon, to which the defendant himself had testified.

We have carefully examined the defendant's other assignments of error and find nothing therein which would merit a new trial of this action.

No error.

