STATE OF NORTH CAROLINA v. DOUGLAS CRUMP

No. 98

(Filed 20 January 1971)

1. Homicide § 14— presumptions arising from intentional use of deadly weapon

When the jury finds from the State's evidence beyond a reasonable doubt that the defendant intentionally shot the deceased with a shotgun and that the shotgun wound so inflicted proximately caused his death, the presumptions arise that the killing was unlawful and that it was done with malice; nothing else appearing, defendant is guilty of murder in the second degree.

2. Homicide § 21— homicide prosecution — sufficiency of evidence

In a prosecution charging defendant with the shotgun slaying of his brother, the issue of defendant's guilt of second-degree murder or of manslaughter was properly submitted to the jury.

3. Criminal Law § 176— motion to dismiss — review of evidence

All admitted evidence is for consideration when passing upon a motion to dismiss as in case of nonsuit.

4. Homicide § 16— admissibility of dying declaration

Testimony in a homicide prosecution that the victim of a gunshot wound stated, during his ride to the hospital, that the defendant had shot him, *held* admissible as a dying declaration of the victim, where there were findings, supported by evidence, (1) that the victim was in

actual danger of death from the gunshot wound and knew it and (2) that the victim, upon arrival at the hospital, was dead from the gunshot wound.

5. **Criminal Law § 76— admissibility of confession — voir dire — insufficiency of evidence to support finding of fact — harmless error**

Although there was no evidence on *voir dire* to support the trial court's finding of fact that the defendant "was advised that if he could not afford a lawyer, one would be appointed for him," testimony relating to defendant's statement to officers that he had shot the deceased was nonetheless competent, where (1) defendant was not under arrest or in custody when he made the statement; (2) defendant himself testified on the trial that he had shot the deceased in self-defense; and (3) there was sufficient evidence, independent of defendant's statement, that the defendant intentionally shot the deceased.

6. **Criminal Law § 75— advising of rights — non-indigent defendant**

A defendant who is able to select and compensate counsel need not be advised in respect of the rights of an indigent.

7. **Criminal Law § 169— admission of State's evidence — similar testimony by defendant**

Exceptions by the defendant to evidence of a State's witness will not be sustained when the defendant or his witness testified, without objection, to substantially the same facts.

8. **Criminal Law § 73— admissibility of hearsay testimony**

If a statement is offered for any purpose other than that of proving the truth of the matter stated, it is not objectionable as hearsay.

9. **Homicide § 9— basis of self-defense**

The plea of self-defense rests upon necessity, real or apparent.

10. **Homicide § 9— plea of self-defense — reasonableness of defendant's belief or apprehension of harm**

In passing upon whether defendant, when he shot the deceased, believed it was necessary to do so to protect and defend himself from death or great bodily harm and had reasonable grounds for that belief, the reasonableness of defendant's belief or apprehension must be judged by the facts and circumstances as they appeared to him when the shooting occurred.

11. **Homicide § 19; Criminal Law § 73— evidence competent on question of self-defense — hearsay evidence**

In a prosecution charging defendant with the shotgun slaying of his brother, defendant's testimony that another brother shouted to him, "Run, Doug, Ben is going to kill us," is admissible to establish defendant's plea of self-defense, notwithstanding such testimony was hearsay.

12. **Criminal Law § 170— harmless effect of trial court's remarks on defendant's testimony**

Defendant's testimony, which was competent on the question of self-defense, that someone had told him that his brother was going to

State v. Crump

kill him, *held* not prejudiced by the trial court's responses directing the defendant not to tell what another person said, where defendant was ultimately permitted to give such testimony in the presence of the jury, and the jury was not instructed to disregard the testimony.

13. **Homicide § 30— failure to submit instruction on involuntary manslaughter**

Trial court's failure to include involuntary manslaughter as a permissible verdict in a homicide prosecution and to instruct the jury with reference to the distinction between manslaughter and involuntary manslaughter, *held* not erroneous when none of the evidence affords a basis for a verdict of guilty of involuntary manslaughter.

14. **Criminal Law § 91— motion for continuance — time to locate missing witness**

Defendant's motion for the continuance of his trial from May to August on the ground that he was unable to locate the whereabouts of his brother, who was expected to testify in support of defendant's plea of self-defense to a homicide charge, *held* properly denied by the trial court in its discretion, where the evidence in support of defendant's motion revealed his lack of diligence in failing to communicate with his counsel prior to the May Session and in failing to locate his brother.

15. **Criminal Law § 91— motion for continuance addressed to the discretion of the trial judge**

A motion for a continuance is addressed to the sound discretion of the trial judge, and his ruling thereon is not reviewable in the absence of a manifest abuse of discretion.

16. **Criminal Law § 131— new trial for newly discovered evidence — jurisdiction of trial court**

Defendant's motion for new trial for newly discovered evidence, which was made after the expiration of the session of court in which he was tried and after his appeal from the judgment of conviction, was properly denied by the trial court on the ground that it lacked jurisdiction to hear the motion.

17. **Attorney and Client § 5— obligation of attorney in a criminal case**

Independent of his obligations to his client, an attorney, having accepted employment by a defendant and having represented him before the court, is obligated to the court to continue to do so unless and until, after notice to the client, the court permits him to withdraw for cause or by reason of defendant's consent to the termination of his employment.

APPEAL by defendant from *Snepp, J.,* May 1970 Session of RUTHERFORD Superior Court, transferred for initial appellate review by the Supreme Court under an order entered pursuant to G.S. 7A-31(b)(4).

Criminal prosecution on an indictment which charged, in the form prescribed by G.S. 15-144, that defendant, on Novem-

ber 30, 1969, "feloniously, wilfully, and of his malice afore-thought, did kill and murder Walter Ben Crump," etc.

After a preliminary hearing on December 11, 1969, at which defendant was represented by Carroll W. Walden, Jr., Esq., privately-retained counsel, the District Court found probable cause and set bond ($5,000.00) for defendant's appearance at the next session of Rutherford Superior Court. The indictment was returned at March 1970 Session. When the case was called for trial at May 1970 Session, defendant, through Mr. Walden, moved for a continuance. The court denied this motion and de-fendant excepted. The case then proceeded to trial on defend-ant's plea of not guilty, at which time defendant was repre-sented by Mr. Walden.

The solicitor announced that the State would not place de-fendant on trial for murder in the first degree, but would place him on trial for second degree murder or manslaughter, as the evidence might warrant.

Evidence was offered by the State and by defendant.

The State's evidence, summarized except where quoted, tends to show the facts set forth below.

Sue Toney and Walter Ben Crump (Ben), by whom Sue had two children, had been living together for three years and three months. On November 30, 1969, they were living with Sue's parents, Mr. and Mrs. Tom Toney, on Duncan's Creek Road, Rutherford County. In addition to the family home, there was an old abandoned house on Mr. Toney's property. In Sue's words: "There was no electricity or anything in the house, but there was a bed and table and stuff that wasn't any good." Ben stayed there at night sometimes. An old dirt road, which crossed a bridge, led from the back of the Toney home to the abandoned house.

On November 30, 1969, about 2:00 a.m., Sue heard a shot and Ben's voice. Leaving her father's home, she went out the dirt road and found Ben lying in the road a few feet from the bridge. His head was on the shoulder of the road. His legs and body were in the road. There was blood all over his leg around the thigh and on the road. Using the bottom part of her gown, Sue tried to tie a tourniquet about Ben's leg "up above where he was hurt."

State v. Crump

Ben was put in Mr. Toney's car. Mr. Toney started to drive but was "shook up so he couldn't hardly drive." They went to the home of Jim Gamble, Sue's brother-in-law. This was "a little over a mile" from where Ben was "picked up." Then Jim Gamble took over the driving in the Toney car. En route to the Rutherford Hospital, they met L. D. Davis, a member of the State Highway Patrol, on RPR #1007 "just north of Sunshine." After talking briefly with Davis, they proceeded to Washburn's Store where Ben was transferred to the Rescue Squad ambulance. The ambulance proceeded directly to the hospital in Rutherfordton. Upon arrival there at 3:45 a.m., Ben was dead.

An expert witness, Dr. Harry Hendricks, who examined Ben's body shortly after its arrival at Rutherford Hospital, testified that in his opinion Ben died from bleeding caused by a large wound which "was across the large blood vessel in the upper thigh," inflicted by a shotgun; and that, in his opinion, Ben would not have died had he received medical attention "within 30 minutes or so" from the time he was shot.

Sue was with Ben, first in the Toney car and later in the ambulance. Sue testified Ben told her that Douglas, his brother, had shot him; that he made these statements while lying in the back of the Toney car, with his head in Sue's lap. Over objections by defendant, the statements attributed to Ben by Sue were admitted as dying declarations.

When Sue was going from her father's house to Ben, she met defendant (Ben's brother) coming out the road towards her father's house. She and Howard Crump, Ben's oldest brother, got to where Ben was lying in the road about the same time.

Near the same place on RPR #1007, "just north of Sunshine," where he had stopped the Toney car, and about an hour and a half later, Patrolman Davis met and stopped a pickup truck operated by Dale Crump, in which Dale Crump, Howard Crump, Douglas Crump, and "two girls" Davis did not know, were riding. A twelve-gauge double-barreled shotgun was in the truck. Over defendant's objections, Patrolman Davis was permitted to testify that defendant stated, referring to the shotgun in the truck, that "that was the gun he shot Ben Crump with and that was the shell he shot him with." This was "the only one in the gun." Patrolman Davis took possession of the shotgun and put it in his patrol car. Defendant was put in the car of one

of the deputies. Later, Patrolman Davis turned over the shotgun to the Sheriff's Department at the County Jail.

Evidence offered by defendant consists of the testimony of defendant, of Howard Crump, of Betty Crump, defendant's wife, and of Ruth Carpenter, a sister of the Crump brothers.

Mrs. Carpenter and Betty Crump testified in substance that Ben had a general reputation for violence and fighting.

With reference to events prior and subsequent to the shooting, Betty Crump testified in substance as follows: Dale Crump and his wife, Judy Crump, had come over from Shelby to spend the weekend with Douglas and Betty in the Mall Walker residence in Sunshine. They arrived about 5:00 p.m. About 6:30 or 7:00 p.m., "it was already getting dark," Douglas and Dale left in Dale's pickup truck stating they were going over to see Ben for a little while. Douglas took his shotgun, saying he was going to show it to Ben. About 2:00 a.m., after the shooting, Dale returned in the pickup truck. Betty and Judy had not gone to bed but were "waiting for the men to get back." Betty and Judy got in the truck with Dale. At that time she saw the shotgun in Dale's truck. Dale drove the truck (approximately six miles) to the Toney house. Douglas was standing "at the porch." When he saw the truck come up the road, Douglas walked to the gravel road and stopped. Betty got out and went to him. Douglas was crying and he was nervous and shaking all over. In Betty's words, "Ben had already been taken to the doctor . . . ."

Evidence offered by defendant, which does not contradict but complements the State's evidence, tends to show the facts narrated in the following numbered paragraphs.

1. It was approximately 500 yards from Duncan's Creek Road to the abandoned house. The dirt road leading from the Toney home to the old abandoned house behind it was old, narrow, little-used and bordered with bushes. The bridge was about midway between the two houses.

2. In one of the three rooms of the abandoned house there were an old bedstead, a table and a fireplace. The only light, inside or outside of the abandoned house, was from the fire in the fireplace.

3. Howard, aged 38, was the oldest of the four Crump brothers. He lived in a cabin at the end of Duncan's Creek Road,

about three miles from the scene of the shooting. Ben, aged 33, was next. He was six feet and three inches tall and weighed about 170 pounds. He lived on the Toney premises, often staying at nights in the abandoned house. Dale, about 24 years old, then lived in Shelby with Judy, his wife. Douglas, aged 21, was five feet tall. He lived with his wife, Betty, in the home of Mall Walker, his father-in-law, in Sunshine, about six miles from the scene of the shooting.

Uncontradicted evidence tends to show the four Crump brothers were the only persons present preceding and at the time of the shooting. Testimony as to Ben's dying declarations is set forth in the opinion. Dale was not present at the trial. Douglas and Howard were the only witnesses who testified as to what occurred preceding and at the time of the shooting.

Douglas testified in substance as follows. Douglas was at the abandoned house during the afternoon of Saturday, November 29, 1969, at which time Ben tried to pick a fight with him. Later he left the Walker home in Sunshine in Dale's truck. At that time, Douglas put his shotgun, which had been in the Walker house, in the truck. He was taking it along to show it to Ben; also, Dale wanted to try it out. They went to the abandoned house. When Ben asked to see the shotgun, Dale went to the truck, brought it into the house where all looked at it. Later, all four (Howard, Ben, Dale and Douglas) left the abandoned house in Dale's truck and went to a place on Highway #18 where they got "some more beer and came back." Dale was driving. The shotgun was left in the house, lying on the table. On the way back to the old house, "Ben wanted to start a fight," and at one point Douglas got out of the truck and ran from him. All four had been drinking. Douglas had been drinking beer. Ben had been drinking "white" liquor. During the evening, on several occasions, Howard had stopped Ben from beating Douglas. Howard was on the porch when Douglas went into the abandoned house and told Dale he was leaving. About this time, Ben picked up a .22-caliber rifle, went to the front door with it and hit Howard over the head with it. While Ben was wrestling with Howard in the yard and beating him, Douglas started out the road towards the truck. Dale tried to stop Ben. Ben knocked Dale down. Dale called, "run, Doug, Ben is going to kill us." Ben was running towards Douglas saying that he was going to kill him. Douglas "hollered as loud as (he) could 3 times and said STOP and he didn't." When Douglas fired the gun, Ben was

coming on him. Douglas testified that Ben told him, "I'm going to kill you," and that he (Douglas) "had to do something." After the shooting, Douglas laid the shotgun on the bridge. Howard sent Douglas to Mr. Toney to request him to take Ben to the hospital. Douglas went to the home of Charles Greene, who lived some 200 yards from where Ben had fallen, "to see if (he) could get Ben a way to the hospital." Greene refused. After he returned, Mr. Toney drove his car out the road. The three brothers put Ben in the Toney car. Douglas, who was drunk or had been drinking, tried to get Mr. Toney from under the steering wheel so he could drive the Toney car. Mr. Toney refused and drove the car from the scene of the shooting towards Rutherfordton. Sue and Ben were in the back seat, Ben's head in Sue's lap. Douglas sat alone on Toney's porch until Dale returned in the truck with Betty and Judy.

Douglas testified he talked to a Mr. Russell Duncan who asked him if he shot Ben and that he (Douglas) told Duncan, "Yes, in self-defense." Douglas also testified that Duncan was in the courtroom while he (Douglas) was testifying.

Howard testified in substance as follows: Ben struck him across the top of his head with a rifle. The blow knocked him from the two-foot high porch. He fell to the ground, bloody and unconscious. He regained consciousness when he heard a gun fire. He heard Ben hollering, "Come over here and help me." Sue Toney, in response to Ben's call, came running to Ben. He (Howard) corded Ben's leg using a part of Sue's gown and twisting it with a stick. "It was so dark that (he) had to light (his) lighter to see where the bleeding was coming from." There was blood on his own face which he had to keep wiping off. Under these circumstances, he did the best he could to stop Ben's bleeding. He remained in the vicinity of the Toney home until Dale, accompanied by Betty and Judy, returned from the Walker house in Sunshine. He and Douglas got in the truck. The five were on their way to the hospital when stopped near Sunshine by Patrolman Davis, Sheriff Huskey and his deputies. The officers arrested Howard, Dale and Douglas and took them to the Rutherford County Jail.

The jury returned a verdict of guilty of manslaugher; and, upon this verdict, the court pronounced judgment that defendant be confined in the State's prison for not less than seven nor more than ten years.

Defendant, through his trial counsel, gave notice of appeal. On May 21, 1970, defendant executed an affidavit of indigency. The court, upon finding that defendant was an indigent, appointed Hollis M. Owens, Jr., Esq., to represent defendant and perfect his appeal to the Court of Appeals.

*Attorney General Morgan and Assistant Attorney General Vanore for the State.*

*Hollis M. Owens, Jr., for defendant appellant.*

BOBBITT, Chief Justice.

[1, 2] Assignments of error based on exceptions to the denial of defendant's motion(s) for judgment as in case of nonsuit are without merit. The evidence offered by the State was amply sufficient to support a finding that defendant intentionally shot Ben and that the shotgun wound so inflicted proximately caused Ben's death. If the jury so found from the evidence beyond a reasonable doubt, two presumptions arose: (1) That the killing was unlawful, and (2) that it was done with malice; and, nothing else appearing, defendant would be guilty of murder in the second degree. *State v. Propst*, 274 N.C. 62, 71, 161 S.E. 2d 560, 567, and cases cited. If and when these presumptions arise, it is incumbent upon the defendant to satisfy the jury of facts which justified or mitigated the killing in accordance with legal principles too well settled to warrant reiteration.

[3] It is noted that all *admitted* evidence is for consideration when passing upon a motion to dismiss as in case of nonsuit. *State v. Walker*, 266 N.C. 269, 272, 145 S.E. 2d 833, 835. Questions raised by defendant as to the competency of portions of admitted State's evidence are discussed below.

[4] Defendant assigns as error the admission of Sue Toney's testimony that, during their travel towards the hospital in Rutherfordton, Ben told her that Douglas had shot him. Upon objection to the admission of this testimony, the court, in the absence of the jury, conducted a *voir dire* hearing at which Sue Toney and Patrolman Davis testified. At the conclusion of the evidence, the court made the following factual findings: "1. The statement was made after Ben Crump had sustained a gunshot wound in his upper thigh and was en route to a hospital. 2. The deceased was, at the time, in actual danger of death. 3. The deceased stated that he knew he was dying and told the witness,

Sue Toney, to take care of their children. He also stated to Patrolman L. D. Davis of the Highway Patrol that he was dying. 4. The deceased had full apprehension of his danger. 5. Death, thereafter, ensued from the gunshot wound, the deceased being dead upon arrival at the Rutherford Hospital, as testified to by Dr. Hendricks." The evidence fully supports the quoted findings. Hence, the court properly admitted as dying declarations the testimony of Sue Toney as to statements made to her by Ben. *State v. Brown,* 263 N.C. 327, 332-333, 139 S.E. 2d 609, 612, and cases cited.

It is noted that, after Sue's testimony as to Ben's declaration had been admitted, Patrolman Davis testified, *without objection,* that when he stopped the Toney car, Ben was in the back seat, lying face up with his head in Sue's lap, at which time Ben said: "I'm dying, I'm dying, my brother shot me."

[5] Defendant assigns as error the admission of the testimony of Patrolman Davis that, when he stopped the pickup truck operated by Dale in which defendant and others were riding, defendant stated in substance he had shot Ben and identified the shotgun and the shell with which he had shot him. Upon defendant's objection to the admission of the testimony, the court, in the absence of the jury, conducted a *voir dire* hearing at which the only testimony was that of Patrolman Davis. At the conclusion of the evidence, the court made the following factual findings: "Before making any statement, the defendant was advised that he had a right to remain silent; that anything he said might be used against him; that he had a right to have a lawyer present before answering any questions; that if he could not afford a lawyer, one would be appointed for him; and if he started answering questions, he might stop at any time. He was then asked (if) he wanted a lawyer and stated that he understood his rights and he thereafter freely, voluntarily, without coercion made a statement to Trooper Davis." The sole ground on which defendant bases this assignment is that the evidence on *voir dire* did not support the court's finding that defendant "was advised that if he could not afford a lawyer, one would be appointed for him . . . ."

Unquestionably, the evidence at the *voir dire* hearing supports fully all of the court's factual findings other than the particular finding now challenged by defendant. With reference to the challenged finding, the record discloses: Defendant was advised of his constitutional rights by Sheriff Huskey. Huskey

so advised defendant by reading to him the statement of constitutional rights set forth on a card handed to him by Patrolman Davis. The court asked Davis, "Do you still have that same copy with you?" Davis answered, "Yes." The record is silent as to whether this card was shown to the court. When Davis was asked to "tell His Honor what Sheriff Huskey read to Mr. Douglas Crump on the morning of November 30th, 1969," the narration by Davis did not include a statement by Huskey to the effect that "if he (defendant) could not afford a lawyer, one would be appointed for him." According to Davis, defendant stated he understood his constitutional rights and proceeded voluntarily to make the statements attributed to him by Davis in his testimony before the jury.

Since the record does not disclose the contents of the card from which Sheriff Huskey read, it must be conceded the evidence was insufficient to support the challenged finding. Even so, for reasons stated below, error in that respect was insufficient to render incompetent the testimony of Davis as to statements made by defendant to the effect he had shot Ben with the identified shotgun and (spent) shell. Nor does it appear that such error was prejudicial to defendant.

[6] It does not appear that defendant was then an indigent and unable to compensate counsel of his choice. In fact, at the preliminary hearing on December 11, 1969, defendant was represented by privately-retained counsel. If, in fact, defendant was able to select and compensate counsel, it was unnecessary to advise defendant in respect of the rights of an indigent. *State v. Gray,* 268 N.C. 69, 81-83, 150 S.E. 2d 1, 10-12.

[5] Defendant was not under arrest or in custody when the statements attributed to him were made. Having been advised of the shooting and presumably of Ben's death, the officers, as was their duty, proceeded to investigate whether a crime had been committed and, if so, by whom. In their investigation, they undertook to find out what they could from the persons who were present when the shooting occurred. Obviously, they had reason to suspect that defendant had shot Ben. However, they knew nothing of the circumstances under which the shooting had occurred. The record does not indicate any question asked by any officer. Rather, it indicates that, after being advised of his constitutional rights, defendant voluntarily made the statements attributed to him. When the statements were made, defendant's two older brothers, Howard and Dale, and Dale's wife

and defendant's wife were present. The evidence is unclear as to whether defendant was under restraint when his statements were made. Nothing occurred that could be considered an "incommunicado interrogation of individuals in a police-dominated atmosphere." There is strong basis for the contention that, under the circumstances, it was not necessary to give any of the warnings listed in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed. 2d 694. *Cf. State v. Meadows,* 272 N.C. 327, 336-339, 158 S.E. 2d 638, 644-646.

Conceding, *arguendo,* that the circumstances required that defendant be warned of his constitutional rights in strict compliance with the specific warnings set forth in Miranda, the fact that the warnings given defendant were incomplete was not prejudicial to defendant. At trial, defendant testified that he shot Ben and testified to the circumstances under which he did so. His contention and testimony was that he did so in self-defense.

[7] "Exceptions by the defendant to evidence of a State's witness will not be sustained where the defendant or his witness testifies, without objection, to substantially the same facts. *S. v. Matheson,* 225 N.C. 109, 33 S.E. 2d 590. Likewise, the admission of evidence as to facts which the defendant admitted in his own testimony, cannot be held prejudicial. *S. v. Merritt,* 231 N.C. 59, 55 S.E. 2d 804." *State v. Adams,* 245 N.C. 344, 349, 95 S.E. 2d 902, 906; *State v. McDaniel,* 272 N.C. 556, 563, 158 S.E. 2d 874, 881, vacated 392 U.S. 665, 20 L. Ed. 2d 1359, 88 S.Ct. 2310, on remand 274 N.C. 574, 164 S.E. 2d 469.

It is noteworthy that, independent of the statements attributed to defendant on the occasion of his arrest, the State's evidence was sufficient to support a finding that defendant intentionally shot Ben and thereby proximately caused his death.

[8-12] Defendant assigns as error the responses of the court to the solicitor's objection to defendant's testimony that Dale hollered to him, saying, "run, Doug, Ben is going to kill us." This testimony was competent for consideration as to whether defendant shot Ben in self-defense under circumstances when it was or reasonably appeared to be necessary to do so to protect and defend himself from death or great bodily harm. The reasonable effect of Dale's statement upon defendant's apprehension of danger of death or great bodily harm rather than the truthfulness of what Dale said is the basis upon which the testimony as

to Dale's statement was competent. "If a statement is offered for any purpose other than that of proving the truth of the matter stated, it is not objectionable as hearsay." Stansbury, North Carolina Evidence § 141 (2d ed. 1963). The plea of self-defense rests upon necessity, real or *apparent*. In passing upon whether defendant, when he shot Ben, believed it was necessary to do so to protect and defend himself from death or great bodily harm and had reasonable grounds for that belief, the reasonableness of defendant's belief or apprehension must be judged by the facts and circumstances as they appeared to him when the shooting occurred. *State v. Kirby,* 273 N.C. 306, 310-311, 160 S.E. 2d 24, 27. As stated by Justice Branch in *State v. Johnson,* 270 N.C. 215, 219, 154 S.E. 2d 48, 52: "(A) jury should, as far as is possible, be placed in defendant's situation and possess the same knowledge of danger and the same necessity for action, in order to decide if defendant acted under reasonable apprehension of danger to his person or his life." Dale's outcry was one of the circumstances for consideration by the jury in order to place them as far as possible in the position of defendant when the shooting occurred.

The record of the direct testimony of defendant includes the following:

". . . . When we got back to the house, Howard was sitting on the front porch and I went in the house and told my brother Dale 'Dale, I am leaving.'

(THE FOLLOWING IS GIVEN IN TRANSCRIPT FORM:)

"THE COURT: What brother are you talking about?

"A. Dale. He said, 'well—

"MR. LOWE: Objection to what Dale said now.

"THE COURT: Don't say what anybody else said.

"A. I told my brother, —well, I just told him and I went out the door and before I got out the door, my brother Ben picked up a .22 rifle and hit Howard over the head with it and him and Howard was wrestling in the yard, fighting. So I went out to the truck and I reckon—

"MR. LOWE: Objection to what he reckons.

"THE COURT: Just tell what you did.

State v. Crump

"A. I went out to the truck and before I got to the truck, Dale hollered and told me—

"MR. LOWE: Objection to what Dale said.

"THE COURT: Don't say what Dale said.

"DEFENDANT'S EXCEPTION AND ASSIGNMENT OF ERROR NUMBER FIVE: Defendant excepts to and assigns as error the sustaining of the objection by the State to the testimony of the defendant that his brother Dale hollered and told him, 'run, Doug, Ben is going to kill us.' This is defendant's exception and assignment of error number 5.

"A. He said, 'run, Doug, Ben is going to kill us.'

"MR. LOWE: Objection.

"THE COURT: Ask him questions.

(RESUME NARRATIVE FORM:)

"I heard somebody say something to me. As a result of what I heard I started running. I ran out the road toward the truck. . . . I was running from Ben Crump, my brother. . . ."

[12] The record indicates that each time Solicitor Lowe objected the court's response was to direct the witness (defendant) not to tell what Dale had said. In disregard of the court's instruction, defendant proceeded to testify that Dale had said, "run, Doug, Ben is going to kill us." Again, when Solicitor Lowe objected, the court's response was a direction (presumably to defendant's counsel) to ask questions. So far as the record shows, Solicitor Lowe made no motion to strike the answer given by defendant. Nor does it appear that the court instructed the jury to disregard defendant's testimony with reference to what Dale had said. Moreover, the record leaves in doubt whether defendant's trial counsel interposed any objection whatever to the attempt by the court to prevent defendant from testifying to what Dale had said. The quoted language indicates that "DEFENDANT'S EXCEPTION AND ASSIGNMENT OF ERROR NUMBER FIVE" were incorporated simultaneously in the record when the case on appeal was prepared.

It seems probable the trial judge when he cautioned defendant not to tell what Dale had said was then unaware of the nature and content of any particular statement made by Dale. This would seem to explain why, after the testimony as

to Dale's statement was given, the court took no action to strike the statement and to instruct the jury to disregard it in their deliberations.

Since the testimony was given in the presence of the jury, and since the jury was given no instruction to disregard it, it seems clear that defendant was not prejudiced by the general cautions of the court to defendant to tell what happened rather than what somebody else said.

[13] Defendant assigns as error the court's failure to include involuntary manslaughter as a permissible verdict and to instruct the jury with reference to the distinction between manslaughter and involuntary manslaughter. This assignment is insubstantial. None of the evidence effords a basis for a verdict of guilty of involuntary manslaughter.

[14] Defendant excepted to and assigned as error the denial of his motion at May 1970 Session for a continuance until the August 1970 Session. According to the record before us, the motion and affidavit discussed below constitute the only matters before the court when the motion for continuance was under consideration.

The unverified motion by Mr. Walden, "(t)he undersigned attorney of record for the defendant," set forth *inter alia* that defendant's defense to the pending murder charge against him was "expected to be self-defense"; that defendant had recently told him that Dale Crump, defendant's brother, was an eyewitness; that defendant told him he did not know what Dale would testify but expected him to testify "that the deceased was advancing on the defendant with a knife"; that he (Walden) had not seen or heard from defendant since the March 1970 Session; that defendant had furnished him "no forwarding address or other information" as to how to contact him and prepare his defense; and that he (Walden) believed that Dale Crump was "a necessary witness to properly conduct the trial of this case in behalf of the defendant."

An affidavit of defendant set forth *inter alia* that his brother, Dale Crump, was an eyewitness to the shooting; that he had lived at 232 Putnam Street, Shelby, N. C., but had moved; that he did not know Dale's new address but believed he lived in Shelby and worked in Charlotte; that he had not contacted Mr. Walden since the March 1970 Session and did not inform him that Dale "was desired for his defense until approximately 3:30

p.m. on Tuesday, May 19, 1970"; that he expected Dale to testify that, "on the date of the alleged slaying," he heard Ben say "that he was going to kill this defendant"; that since the March 1970 Session he had resided at Linville Falls, North Carolina; and that he had not furnished Mr. Walden "any facts or other evidence about his defense since said time (March 1970 Session) and (had) not contacted him in any manner until the present session of this court commenced."

These additional facts are noted: (1) The May 1970 Session convened on May 11, 1970; and (2) it does not appear that a subpoena was issued for Dale Crump.

As stated by Justice Sharp in *State v. Phillip*, 261 N.C. 263, 267, 134 S.E. 2d 386, 390: "Employment of counsel does not excuse an accused from giving proper attention to his case; he has the duty to be diligent in his own behalf." Evidence of an unexplained failure to communicate with his counsel or to locate Dale Crump and arrange for him to be present for the trial shows an utter lack of diligence on the part of defendant.

[15] "A motion for a continuance is addressed to the sound discretion of the trial judge and his ruling thereon is not reviewable in the absence of manifest abuse of discretion." 7 Strong, N. C. Index 2d, Trial § 3. Under the circumstances stated, there is no evidence that the denial of the motion for a continuance constituted an abuse of discretion.

[16] Lastly, defendant assigns as error the denial as a matter of law of his "MOTION FOR NEW TRIAL."

The verdict was returned, the judgment was pronounced and the appeal entries were made on May 21, 1970. On the same date, defendant was adjudged an indigent. On May 22, 1970, Mr. Owens, his present counsel, was appointed to represent defendant in perfecting his appeal.

On June 3, 1970, defendant, represented by Mr. Owens, filed in the Superior Court of Rutherford County a "MOTION FOR NEW TRIAL," supported by affidavits of Dale Crump and of Russell Duncan. The affidavit of Dale Crump sets forth with particularity the events preceding, at the time of and subsequent to the shooting. Suffice to say, the facts set forth, if accepted, were quite favorable to defendant. Russell Duncan, in his affidavit, states: "That he is a deputy sheriff of Rutherford County, North Carolina; that on November 30, 1969, he went to a house

State v. Crump

located on the Duncan's Creek Road in Duncan's Creek Township, Rutherford County, North Carolina, about a quarter of a mile from Tom Toney's house, along with other officers and made an investigation of the shooting of Ben Crump; that he found a .22 automatic rifle near the steps of the house; that said rifle was twisted and bent; that there was blood on the porch of the house; and that there was blood on the rifle barrel and on the rifle stock. That the affiant has said rifle in his custody; that the said affiant was not called to testify on behalf of the defendant Douglas Crump when said defendant was tried at the May 1970 Term of Rutherford County Superior Court Division of the General Court of Justice." This affidavit of a deputy sheriff tends to corroborate strongly the testimony of defendant and of Howard Crump at trial and of Dale Crump's affidavit to the effect that Ben Crump, the deceased, a short time before the shooting occurred, had beaten Howard Crump with a rifle at or near the porch with such force as to leave a trail of blood on the porch and blood on the rifle barrel and rifle stock.

It was agreed by the solicitor and by Mr. Owens that the motion would be heard by Judge Snepp, the trial judge, at the June 1970 Session of the McDowell Superior Court.

On June 10, 1970, Judge Snepp denied defendant's motion as a matter of law on the ground "that notice of appeal . . . having been duly given, the Superior Court is now without jurisdiction to entertain a motion for a new trial on the grounds of newly discovered evidence."

We take judicial notice of the fact that the two-week session of Rutherford Superior Court which commenced on May 11, 1970, had terminated by limitation prior to the filing of the "MOTION FOR NEW TRIAL."

"Motion for new trial for newly discovered evidence may be made in the trial court only at the trial term, or, in case of appeal, at the next succeeding term of the Superior Court after affirmance of the judgment by the Supreme Court." 3 Strong, N. C. Index 2d, Criminal Law § 131. Decisions cited in support of this well-established rule include the following: *State v. Casey,* 201 N.C. 620, 161 S.E. 81; *State v. Edwards,* 205 N.C. 661, 172 S.E. 399; *State v. Gibson,* 229 N.C. 497, 50 S.E. 2d 520; *State v. Morrow,* 262 N.C. 592, 138 S.E. 2d 245. Moreover, when the "MOTION FOR NEW TRIAL" was made, the May 1970 Session

had expired by limitation; and defendant's appeal from the judgment on the verdict had removed the case from the superior court and had transferred jurisdiction to the Supreme Court. 1 Strong, N. C. Index 2d, Appeal and Error § 16, p. 138, and cases cited.

Under the circumstances, Judge Snepp rightly denied the "MOTION FOR NEW TRIAL" as a matter of law on the ground that jurisdiction then vested in the Appellate Division. Of course, the matters set forth in the affidavits of Dale Crump, of Russell Duncan and of Mr. Walden (referred to below) will be for consideration by the presiding judge if a motion for new trial on the ground of newly discovered evidence is made at the next session of the Superior Court of Rutherford County subsequent to the filing of this opinion.

We take notice of the fact that the record also contains an affidavit by Mr. Walden. Although not dated, the record indicates it was sworn to on August 6, 1970. This affidavit, although not pertinent to the question before us, sets forth *inter alia* the following. Walden was employed by defendant to represent him at the preliminary hearing on December 11, 1969; that he did so and, pursuant to their agreement, was paid one hundred dollars for this appearance, which included his successful effort to obtain a reduction in defendant's appearance bond; that, under their agreement, this ended Walden's employment by defendant; that defendant was advised by Walden that Walden would not represent him in the trial in the superior court unless and until he was paid a fee of one thousand dollars; that defendant did not reemploy Walden and Walden received no additional compensation; that Walden had not seen defendant from the return of the indictment at March 1970 Session until the May 1970 Session; that he appeared for defendant at the May 1970 Session because the court, in the absence of an order permitting him to withdraw as counsel, required that he do so; and that, on account of his lack of contact with defendant and the fact that he had not been reemployed, Walden went to trial without opportunity and information to prepare defendant's defense.

Pertinent to defendant's seeming lack of responsibility and diligence in arranging and preparing for the defense of his case, it is noted that defendant testified at trial that, although he "went to the 7th grade in school," he "cannot read and . . . cannot write."

[17] In view of what appears now to have been a misunderstanding between attorney and client which resulted in inadequate preparation for trial, it seems appropriate to say: Independent of his obligations to his client, an attorney, having accepted employment by a defendant and having represented him before the court, is obligated *to the court* to continue to do so unless and until, after notice to the client, the court permits him to withdraw for cause or by reason of defendant's consent to the termination of his employment. If employment is accepted for a specific limited purpose, the facts in connection therewith should be fully disclosed (preferably in writing) to the court.

Since we find no legal error in the trial below, the verdict and judgment will not be disturbed. Whether defendant should be awarded a new trial on account of the facts set forth in the affidavits of Dale Crump, Russell Duncan and Mr. Walden, his original counsel, will be for consideration, together with all other evidence that may be adduced, by the presiding judge at the next session of superior court after the filing of this opinion if a motion therefor is made in apt time.

No error.